204 N.J. Super. 521 (1985)
499 A.2d 530
JOHN S. CRUMB AND ANNA CRUMB, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
BLACK & DECKER, (U.S., INC.) DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1985.
Decided October 17, 1985.
*522 Before Judges PRESSLER, DREIER and BILDER.
Jeremy Doppelt argued the cause for appellants (Jack I. Doppelt, attorney; Jeremy Doppelt, on the brief).
Carl Greenberg argued the cause for respondent (Budd, Larner, Kent, Gross, Picillo, Rosenbaum, Greenberg & Sade, attorneys; Carl Greenberg, of counsel; David J. Reich, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
*523 Plaintiff has appealed from a dismissal of his complaint based upon the trial judge's molding of a judgment for defendant based upon a jury verdict finding him 60% responsible for the accident. Plaintiff's motion for a new trial limited to damages was denied and plaintiff has appealed from both the judgment and the denial of his motion.
On May 7, 1981 plaintiff cut through most of anteromedial (front and towards the inner side) tissues in his right thigh down to the bone while using a power saw manufactured by defendant. His superficial femoral artery, the chief source of blood below the knee was 80% severed. After an operation and weeks of hospitalization he suffers from a permanent depressed scar, a disability on exertion of his leg and a permanent loss of sensation in his lower leg.
The injury occurred while plaintiff was sawing branches into logs as directed by his employer. The tool was an eight inch circular saw which plaintiff had brought from home, having purchased it in 1973. The saw had been manufactured by defendant in 1956 or 1957 and was designed so that a protective guard would automatically cover the blade as it was being withdrawn from the material that was being cut. The guard pivoted around the exposed portion of the blade and was designed to pull closed as the saw was withdrawn by means of a spring extending from the housing to a hook affixed to the guard.
Plaintiff testified that he had used the saw many times since it was purchased by him and on all occasions the guard closed as it should have. He chose to use this saw since it was more powerful than another saw supplied by his employer which was in any event being used by another employee at the time. On this occasion he was sitting cross-legged on the ground cutting the branches first on one side and then on the other in order to extend the cut completely through the wood. On each occasion he cut by pushing the saw away from him thus opening the *524 guard, and when he retracted the saw the guard closed. He did not know precisely when he was cut since he felt nothing, he merely noted that his leg was deeply cut and he was bleeding profusely. When he inspected the saw some time after the accident, but without its having been tampered with, he noted that the spring was not attached as it should have been but rather was wedged in the housing in a manner that kept the guard in an open position, thus affording no protection. During the approximately one hour that he had been working on this job he never noticed specifically whether the guard opened and closed, since he merely assumed that the guard would have performed its function as it always had since he purchased the saw. He had cut approximately 30 branches into logs when the accident occurred.
Plaintiff and defendant each produced expert witnesses to explain how the accident could have occurred. Plaintiff's expert, Louis Howarth, testified that the spring had wedged itself between the guard and housing so that the guard could not close even with the force of gravity due to insufficient clearance. He claimed that the spring came loose because of bending in the area of the hook and that a differently designed spring and hook could have avoided this occurrence. Specifically, he noted that a torsion spring instead of an extension spring would have prevented the jamming of the guard and would have permitted, as a last resort, the guard to pull down by force of gravity even if the spring were not utilized. Also he claimed a spring of smaller diameter would have permitted clearance between the housing and the guard, eliminating the possibility of the spring wedging the guard in an open position. Lastly, he stated that a hook with two loops rather than one would have prevented the spring from bending and catching the guard as it came down. He noted that these alternatives would have amounted to an insignificant additional cost of manufacture and, if utilized, would have, in all engineering probability, prevented plaintiff's accident. According to Howarth, the 1954 standards of the American National Safety Institute were violated *525 in that the guard in question did not adequately cover the blade to the depth of the teeth and automatically and instantly return to a covering position after a cut.
Although defendant urged that plaintiff's cross-legged sitting position while cutting materially contributed to the happening of the accident, Howarth gave his opinion that this position played no part in the guard's failure to cover the blade.
Defendant's expert, William Saffell, worked for defendant for 26 years in product development, electrical design and safety assurance. His opinion was that the saw met the applicable safety standards and that the wedging of the spring between the guard and housing was caused by someone intentionally disconnecting the spring. He further stated that either a torsion or extension spring would have been acceptable and would have operated the guard properly, but that there was no need to have a double-wound hook, since it would only make the spring more difficult to install and remove.
He opined that if the guard had been operational at the time of the accident plaintiff could not have been cutting the wood in the manner described without extreme difficulty and annoyance. The saw cut only to a depth of just less than two and three quarter inches, therefore, even using cuts on the opposite sides of the log, plaintiff could not have reached the center of a six inch diameter log. Since plaintiff would have needed a maximum depth with each cut and the guard was thicker than the blade, it would have been in plaintiff's way each time he withdrew the saw from the wood and his solution would have been to disconnect the spring and jam the guard to be sure it stayed open.
Saffell further testified that plaintiff should not have been using this type of saw for the cutting of branches and that he encountered considerable danger in the manner in which he handled the saw. Saffell admitted on cross-examination, however, that if the saw had been pulled back across plaintiff's leg with the guard operational, the pressure of this motion would *526 have closed the guard even faster and would not have presented a danger to plaintiff. We note that if the guard had been operational, the only way plaintiff could have been injured would be if he had cut himself on a forward motion, i.e., that he started his cut behind his leg and cut through his leg on the way to the wood, a highly improbable situation.
The factual issues in the case, therefore, were whether plaintiff wedged open the guard or whether due to some design defect or mechanical failure the spring disattached and became wedged between the guard and the housing, preventing the guard from closing.
The jury was given six interrogatories, four of which bear upon the issues before us:
1. On May 7, 1981 did plaintiff wedge the spring between the lower guard and the housing of the saw, thus disabling the lower guard from operating?
........
2. Was there a defect in the design of the saw which defect was a proximate cause of injury to the plaintiff?
........
3. Was the use made of the saw by plaintiff reasonably foreseeable to a reasonably prudent manufacturer in 1957?
........
4. Did plaintiff voluntarily and unreasonably encounter a known risk in handling the machine in the way that he did?
The first question was answered "no," the next three "yes," and, as noted earlier, the jury in its response to question five attributed 60% of the fault to plaintiff.
Although each of the other questions was separately explained to the jury, question four was not. The trial judge skipped from his explanation of question three to question five relating to the respective percentages. The judge had, however, instructed the jury earlier in his charge that question three related to whether "the plaintiff voluntarily and unreasonably uses this device in a way which exposes him to a known risk voluntarily and unreasonably that that is a fault on his part." The judge also explained that defendant claimed that if *527 the jury "should find that there was a defect which was a proximate cause then we suggest to you that the plaintiff himself was at fault in the way that he used [the saw]." It is clear from the charge as a whole that question four was directed to plaintiff's use of the saw in the cross-legged seated position. In a colloquy with counsel prior to his charge, the judge noted that the difference between the third and fourth questions was that under the third question defendant had to foresee the use of the saw to cut logs, but "not the question of whether the user would be sitting, yogi-fashion on the ground." The next question looked at plaintiff's conduct "distinguishing between [the saw's] use to cut a log and the manner in which it was handled in cutting the log." We are persuaded, therefore, that the import of question four describing plaintiff's "handling the machine in the way that he did," related to his sitting cross-legged and cutting logs in the immediate proximity of his thigh.
Plaintiff first asserts that under Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150 (1979), his conduct should not be assessed at all since he was engaged in an employment task at the time of his injury. The test of Suter is not simply whether plaintiff was injured while performing a task in the course of his employment. Such is a workers' compensation standard, not that applied in a products liability case. Suter held that:
an employee engaged at his assigned task on a plant machine, as in Bexiga [v. Havir Mfg. Corp., 60 N.J. 402 (1972)], has no meaningful choice. Irrespective of the rationale that the employee may have unreasonably and voluntarily encountered a known risk, we hold as a matter of policy that such an employee is not guilty of contributory negligence. 81 N.J. at 167.
The essence of the Suter rule is that the employee had no meaningful choice. He either worked at his assigned task or was subject to discipline or being labelled as a troublemaker. The Suter rule was intended as a rejection of the court's then-recent statements in Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152, 188 (1978), that Bexiga was limited "to those cases where there was no `indication that the unsafety of *528 the machine was known' to the employee." 81 N.J. at 167. In the case before us, however, we need not reach the question of compulsion for plaintiff to use the saw by employment or otherwise. We realize that the saw was not supplied by his employer, and another saw, although less efficient and then being used by another employee, could have been used by plaintiff when it became available. There may or may not have been a measure of compulsion requiring plaintiff to choose between using a piece of potentially unsafe equipment or to run the risk of an adverse employment consequence. We can envision circumstances where the use of an employee's own implement is required by his employer and thus might engender employment pressure if the employee attempted to cease using it, but there is little if any such proof in this case. We do not need to resolve this issue on the facts before us, since the following comparative fault analysis is sufficient to establish plaintiff's exoneration from responsibility.
We foreclose consideration of any percentage of negligence on the part of plaintiff by, first, eliminating any responsibility of plaintiff for not noticing that the guard was wedged open when his thigh was cut, and, second, excluding any relevance of his cross-legged proximity to the cutting blade. As Bexiga held and Suter reiterated: "it would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against." 60 N.J. at 412; 81 N.J. at 167. The safety guard in the case before us was designed to protect against the precise inadvertent motion that resulted in plaintiff's accident, i.e., one that would bring an unguarded blade in contact with the user.
Even if plaintiff under Suter's "assigned task" doctrine does not have blanket protection against the consequences of his conduct, he can resort to the limitation of a plaintiff's relevant conduct established in Cepeda, 76 N.J. at 186-192, and restated both in Suter, 81 N.J. at 167, and Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 562-63 (1980), namely that a *529 plaintiff's conduct will only be considered if it constitutes a voluntary and unreasonable encountering of a known danger. See also Restatement, Torts 2d, § 402A, Comment n. (1965). We must determine, therefore, whether there was a "voluntary and unreasonable encountering by the plaintiff of a known safety hazard of a machine [which was] proximately contributive to the accident." Cepeda, 76 N.J. at 186. An injury caused by mere inattention or ordinary carelessness is insufficient to reduce or bar plaintiff's claim. Green v. Sterling Extruder Corp., 95 N.J. 263, 270 (1984).
In this case the jury determined that plaintiff on the date of the accident "did not wedge the spring between the lower guard and the housing of the saw;" further, it found that the saw had been defectively designed and that this defect was a proximate cause of plaintiff's injuries[1]. We thus must focus upon the precise risk the assumption of which would bar plaintiff's claim. From the thrust of defendant's expert's testimony concerning plaintiff's conduct, if we exclude the alleged conduct of wedging the guard open, we are left only with the manner in which plaintiff was using the saw to cut the branches, i.e. sitting cross-legged and sawing in the immediate proximity of his exposed leg. If the guard had worked properly, however, plaintiff, even in that position, would have been protected from his injury. Though plaintiff may have encountered the risk of an improperly designed guard not working, under Bexiga and Suter we do not permit a defendant to benefit from the failure of a safety device when the injury was *530 the "very eventuality the safety device [was] ... designed to guard against." Bexiga, 60 N.J. at 412; Suter, 81 N.J. at 166-167.
Additionally, we must examine the particular risk that plaintiff is claimed to have assumed. In Cartel Capital Corp. v. Fireco of N.J., supra, a defectively designed fire extinguisher failed to operate and extinguish a fire caused by the employees of a fast food restaurant placing grease-soaked paper plates near an open fire. The Supreme Court pointed out that although the employees voluntarily encountered the known risk that the plates would burn, "[p]laintiff had no forewarning that the system whose purpose was to extinguish fires, irrespective of cause, would fail to function as a consequence of a design defect." 81 N.J. at 563. So too in our case. Plaintiff, although sitting cross-legged and exposing himself to a danger of being injured by the saw, had no knowledge that the safety guard would fail to operate by reason of the design defect established by the jury. The defendant, therefore, failed to show that plaintiff had "actual knowledge of the danger posed by the defective product," and then "voluntarily and unreasonably encountered that risk." Cartel Capital Corp., 81 N.J. at 562-563. Absent such knowledge, plaintiff's conduct in cutting the tree limbs as he did was irrelevant. As in Cartel Capital Corp., "[d]efendant did not meet its burden of proof." Id. at 563.
We determine that the positive answer to jury interrogatory number four, that "plaintiff voluntarily and unreasonably encounter[ed] a known risk in handling the machine in the way that he did," and the determination of percentages in question five should not have been considered after the jury determined both that plaintiff did not wedge the guard in an open position and that the accident was caused by a design defect in the saw. We, therefore, vacate the judgment of dismissal, mold the jury's findings to indicate solely a finding of liability on the part of defendant, and remand this matter to the Law Division for a new trial as to damages only. We do not retain jurisdiction.
NOTES
[1] Although it is possible to read the answer to interrogatory number one that plaintiff did not disable the safety guard on the date of the accident, but had wedged the spring on some prior date, such reading would be inconsistent with the court's instructions concerning that question. The court indicated that the language meant that plaintiff "did not use [the saw] in an improper fashion," and then distinguished question number one from "other means of impropriety that may come in later on," obviously referring to question four (not further explained to the jury) which concerned plaintiff's "handling the machine in the way that he did." The focus was on plaintiff's alleged conduct of wedging the spring, not whether the act took place on a particular date.