248 N.J. Super. 390 (1991)
591 A.2d 643
DONNA TIRRELL, GENERAL ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WALTER TIRRELL, PLAINTIFF-RESPONDENT,
v.
NAVISTAR INTERNATIONAL, INC., PREVIOUSLY KNOWN AS INTERNATIONAL HARVESTER CO., DEFENDANT, AND ROGERS BROTHERS CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1991.
Decided May 21, 1991.
*393 Before Judges J.H. COLEMAN, DREIER and LANDAU.
Robert F. Colquhoun argued the cause for appellant (Colquhoun & Colquhoun, attorneys, Robert F. Colquhoun, on the brief).
John M. Blume argued the cause for respondent (Blume, Vazquez, Goldfaden, Berkowitz & Donnelly, attorneys, Carol L. Forte, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
*394 Defendant Rogers Brothers Corporation, the manufacturer of a flatbed tractor-trailer, appeals from a product liability judgment in favor of plaintiff arising out of the November 12, 1986 death of her late husband. The jury awarded $2,500,000 on plaintiff's wrongful death claim and $50,000 on the survival action for decedent's pain and suffering.
Plaintiff's theory of liability was that the manufacturer's failure to install a back-up signal created a design defect.[1] Decedent was an oiler, a trainee in charge of maintaining a backhoe, and was working laying a gas line from Lambertville to Belle Meade. He, an operating engineer, Louis O'Rourke, and the driver of the tractor-trailer, were directed by their supervisor to go to a site on Highway 31 near Ringoes, where an area of the pavement had settled. The backhoe to be operated by O'Rourke and maintained by decedent had been placed on a flatbed trailer and was driven to the site. O'Rourke and decedent drove their own cars and parked in a nearby lot. O'Rourke and decedent were talking to the foreman in the center of the southbound lane which had been closed to traffic, when the tractor-trailer driver started to back up the rig from where it had been parked at the curb. O'Rourke, who had not heard the tractor-trailer backing up, saw the movement out of the corner of his eye, but by then it was so close that it brushed his arm and knocked the foreman out of the way. He tried to grab decedent who was also knocked to the ground. The trailer's back wheels slowly rolled over decedent's chest. O'Rourke called out to the driver who stopped, leaving decedent between the two sets of tires. Decedent raised his head a little and then slumped down, apparently dead.
*395 The trailer was approximately 45-feet long, and O'Rourke estimated that it had moved two or three trailer lengths when it struck decedent. There was no signalman observing the truck as it backed up, although O'Rourke knew that it was the practice to have someone watching when even a backhoe was moving to make sure no one got in the way. Ironically, as an operator's helper, decedent would perform this function when the backhoe was operated.
The tractor manufacturer's[2] staff engineer's deposition was read to the jury. In that deposition, he noted that there was a blind spot for the driver of the tractor when a backhoe was on the trailer. He personally made the observation and found that in such a situation the driver, despite extended side mirrors, could not see anything behind the trailer. Defendant's president's deposition was also read to the jury. Defendant understood that a function of the trailer would be to carry backhoes, yet the company did no safety tests to determine whether there would be blind spots when a driver was hauling equipment. Furthermore, defendant did not install back-up alarms without request or give advice to its customers of the existence or advisability of back-up alarms.
Plaintiff's expert, George F. Bowden, a registered professional engineer, testified that the only ways one could back up safely with obscured vision to the rear were either to have a flagperson giving signals or to use an audible alarm that was "not only louder than the surrounding noise, but distinctive." There was no question that both electrical and mechanical back-up alarms had been available since the 1950's, would not have affected the utility of the trailer, are quite inexpensive (mechanical alarms costing approximately $35) and are easy to *396 install.[3] It is true that the tractor had two West Coast mirrors, 16-inch vertical mirrors on either side of the vehicle, which gave full visibility without the trailer or with an empty trailer. But, depending upon what was placed on the trailer, visibility could still be obscured by the load. Defendant's president testified that as a manufacturer of low-bed trailers, defendant was regulated by the National Highway Traffic Safety Administration, and he understood that nothing in relevant legislation required back-up alarms, nor did he know of any requirement for such alarms.
Decedent, 28 1/2 years old at his death, earned approximately $35,000 per year as an oiler. O'Rourke, however, was training decedent to be an operating engineer and was about to recommend him for such advancement. As an operator, O'Rourke earned $24 an hour plus $9.25 per hour for benefits. With overtime he made between $65,000 and $80,000 per year, although other operating engineers made more than that. Plaintiff's economic expert testified that decedent had already earned $32,601 in 1986 prior to his demise. Plaintiff had testified in detail concerning the work decedent did at home and the time he spent with her and their four children, ages one, nearly four, six and seven years old at the time of their father's death.[4] The economist factored into the loss equation the time a spouse normally spends working in the house (ten hours per *397 week), even though he acknowledged that this was less than the time decedent normally worked at his house. After deducting what decedent would have paid for his personal expenses, the expert testified that there had been a net earned income loss of $104,000 to the time of trial and a loss of physical household services of $15,865 (then reduced by three percent for sickness). This estimate contained no pecuniary value for the loss of companionship, guidance or advice. See Green v. Bittner, 85 N.J. 1, 11-12, 424 A.2d 210 (1980).
During the direct examination of plaintiff's expert, the attorney asked for a sidebar conference which actually was held in the empty jury room. Harold Braff, Esq., attorney for the tractor manufacturer, noticed a Newsweek magazine on the jury room table and stated to the judge and assembled attorneys, "[B]efore you go, I just wanted you to see what's on the table. `The selling of safety' its a Newsweek article." Although this was not put on the record at the time, the event was noted without objection at the new trial motion. Defendant's argument for a new trial based upon this event will be discussed infra.

I
The original complaint in this matter had charged defendant with negligence, strict liability, breach of warranty and gross negligence. On the first day of trial, plaintiff successfully sought to dismiss its negligence and warranty claims and proceed only on the strict liability count. Initially, counsel for defendant simply responded, "o.k." Later, however, while arguing a motion addressed to peremptory challenges, counsel asserted opposition to the dismissal, stating that plaintiff was trying to "emasculate the defense of contributory or comparative or third-party negligence," and simply wanted to "attempt to impair the defense in this case." The judge adhered to his earlier ruling. Defendant's challenge has been reiterated in this appeal.
*398 There are two definitive answers to the defense argument. First, we have noted that the complaint in this matter was filed September 17, 1987. The New Jersey Product Liability Act, in an explanatory note to N.J.S.A. 2A:58C-1 (L. 1987, c. 197, § 8) provides that the Act, enacted July 22, 1987, applies to "product liability actions filed on or after the date of enactment." Thus, where the Product Liability Act conflicts with the common law, it governs this action. The Product Liability Act no longer recognizes negligence or breach of warranty (with the exception of an express warranty) as a viable separate claim for "harm" (as defined in the Act) caused by a defective product. The Act, in N.J.S.A. 2A:58C-1b(3), defines a "product liability action" as
any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty.
N.J.S.A. 2A:58C-2 established the sole method to prosecute a product liability action.
A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose.... (Emphasis added).
Since a product liability action encompasses "any claim or action brought by a claimant for harm caused by a product," N.J.S.A. 2A:58C-1, (emphasis added), and section 2 describes the sole method of proof, namely that recognized for strict liability claims, it is clear that common-law actions for negligence or breach of warranties (except express warranties) are subsumed within the new statutory cause of action, if the claimant and harm also fall within the definitional limitations of section 1.[5]
*399 The second support for the judge's ruling is the common law which preceded the 1987 Act. In Heavner v. Uniroyal, Inc., 63 N.J. 130, 157, 305 A.2d 412 (1973), the Court determined that a personal injury claim was to be founded on strict liability rather than a breach of an implied warranty under the Uniform Commercial Code. This was reiterated in Realmuto v. Straub Motors, Inc., 65 N.J. 336, 345, 322 A.2d 440 (1974) and Collins v. Uniroyal, Inc., 126 N.J. Super. 401, 406, 315 A.2d 30 (App. Div. 1973), aff'd, 64 N.J. 260, 315 A.2d 16 (1974).
With regard to strict liability having superceded negligence under a common-law theory, in Masi v. R.A. Jones Co., 163 N.J. Super. 292, 297, 394 A.2d 888 (App.Div. 1978), this court determined that the failure to charge negligence in addition to strict liability for a design defect claim was not error. Since the strict liability claim placed a lesser burden upon a plaintiff, an adverse determination concerning strict liability obviated any possible verdict on a negligence theory.[6] In any event, the Product Liability Act has now codified these common-law rules, and only a single product liability action remains.

II
Defendant next contends that decedent, who was neither responsible for nor directly concerned with the operation of the *400 trailer, was excluded from the ambit of the employee comparative negligence rule established in Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 167, 406 A.2d 140 (1979). The Court there held that
an employee engaged at his assigned task on a plant machine, as in Bexiga [v. Havir Mfg. Corp., 60 N.J. 402, 290 A.2d 281 (1972)], has no meaningful choice. Irrespective of the rationale that the employee may have unreasonably and voluntarily encountered a known risk, we hold as a matter of policy that such an employee is not guilty of contributory negligence.
81 N.J. at 167, 406 A.2d 140.
The text of the Product Liability Act itself has no direct bearing on the comparative negligence rules, except insofar as N.J.S.A. 2A:58C-3a(2) (the consumer expectation/obvious danger defense to a design defect claim), may be applicable to some claims. But there is a specific exception in that section for "industrial machinery or other equipment used in the workplace," and the rules are "not intended to apply to dangers posed by products such as machinery or equipment that can feasibly be eliminated without impairing the usefulness of the product." Furthermore, both the Assembly and Senate Statements accompanying the Act expressly disclaim application to workplace injuries:
In particular, sections 2 through 4 are not intended to affect the holding in [Suter], with respect to the application of the principle of comparative fault in cases involving workplace injuries.
Defendant finds solace in the original phraseology of Suter, which could be interpreted as limiting the employee exception to "an employee engaged at his assigned task on a plant machine." 81 N.J. at 167, 406 A.2d 140.[7] This language has given rise to at least two issues: First, is there a limitation to industrial machinery in a plant? Compare Rivera v. Westinghouse Elevator Co., 107 N.J. 256, 260-261, 526 A.2d 705 *401 (1987) (raising but not resolving the issue) with Crumb v. Black & Decker (U.S., Inc.), 204 N.J. Super. 521, 527-528, 499 A.2d 530 (App.Div. 1985), certif. granted, 102 N.J. 386, 508 A.2d 247 (1985), appeal dismissed 104 N.J. 432, 517 A.2d 425 (1986) (applying the Suter protection). Second, should a plaintiff continue to be absolved from a workplace injury when he voluntarily and unreasonably encounters a known risk? See Green v. Sterling Extruder Corp., 95 N.J. 263, 270, 471 A.2d 15 (1984) indicating some question concerning this aspect of the Suter rule).
As to the first issue, by the Legislature's use of the term "workplace injuries," any limitation of the Suter principle to a factory setting would now clearly be inappropriate. The Legislature's intention also to resolve the second issue is less clear from the text of the Act; but the Committee Statements indicate that the Legislature did not want to change the comparative fault rules of Suter. Furthermore, in Crumb, we interpreted the Suter principle:
The essence of the Suter rule is that the employee had no meaningful choice. He either worked at his assigned task or was subject to discipline or being labelled as a troublemaker.
204 N.J. Super. at 527, 499 A.2d 530. It is true that had decedent known that there was no back-up alarm on the trailer, he could have refused to work on the job. But, as we noted in Crumb, such action could subject him to disciplinary action or other adverse consequences. He had no meaningful choice.[8]
A positive answer to the second issue would require us to reconsider the Suter rule, an action which the court has shunned since 1979. We cannot disobey Suter's clear directive. Furthermore, the back-up alarm was not meant to warn an attentive worker who had already seen the trailer backing up. *402 Rather, it was meant to attract the attention of inattentive persons in the area of the danger. As we also noted in Crumb, 204 N.J. Super. at 528, 499 A.2d 530, Suter and Bexiga both stated that "it would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against." 81 N.J. at 167, 406 A.2d 140; 60 N.J. at 412, 290 A.2d 281. Even if decedent had known that he was working with a trailer without a back-up alarm, and the Suter employer comparative fault rule were inapplicable, it would be against public policy, as expressed in Bexiga, Suter, and their progeny, for decedent to be barred by a finding that he had proceeded in the face of a known danger under the circumstances of this case.
Defendant also claims that trade custom showed that trailer manufacturers did not include such back-up alarms, and thus defendant had no duty to do so. This argument was effectively disposed of in Michalko v. Cooke Color & Chem. Co.:
We have repeatedly stated, however, that in this context trade custom is not dispositive of compliance with a legal duty.... A manufacturer may have a duty to install safety devices regardless of whether it was the custom of the trade for the ultimate purchaser to install them.
91 N.J. 386, 397, 451 A.2d 179 (1982) (citation omitted).

III
Defendant asserts that since decedent was neither a user nor consumer of the trailer, but merely a bystander, he may not assert a claim of strict liability. Even if decedent might be considered as other than a "user or consumer," we reject such an interpretation of this strict liability doctrine. Restatement (Second) of Torts, § 402A (1965), caveat (1), notes that the American Law Institute "expresses no opinion as to whether the rules stated in this Section may not apply ... to harm to persons other than users or consumers...." Comment (o) to caveat (1) explains that as of 1965, courts had
not gone beyond allowing recovery to users and consumers.... Casual bystanders, and others who may come in contact with the product, as in the case *403 of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery....
In Monsanto Co. v. Alden Leeds, Inc., 130 N.J. Super. 245, 263, 326 A.2d 90 (Law Div. 1974), and in Lamendola v. Mizell, 115 N.J. Super. 514, 524, 280 A.2d 241 (Law Div. 1971), the courts recognized the right of a third party other than a user or consumer to invoke the rules of strict liability. See also dictum in Suter, 81 N.J. at 171, 406 A.2d 140 (where the court, quoting from Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 835 (1973), appeared to extend the doctrine to those who "came into contact with [the product] or were in the vicinity of it").
The Product Liability Act contains an implicit recognition that one other than a user or consumer is protected by the doctrine. In the exception to the state-of-the-art defense for egregiously unsafe or ultra-hazardous products which have little or no usefulness, the Legislature stated that the defense could be avoided, inter alia, where "[t]he ordinary user or consumer of the product cannot reasonably be expected to have knowledge of the product's risks, or the product poses a risk of serious injury to persons other than the user or consumer." N.J.S.A. 2A:58C-3b(2) (Emphasis added). If a person "other than the user or consumer" was not able to assert a strict liability claim, this language would have been superfluous. Since the Legislature was presumed to know the state of the law when it enacted the Product Liability Act, and provided in the Committee Statements that it did not intend to "affect existing statutory and common law rules ... not expressly addressed by this legislation," we think it clear that plaintiff, even if considered a bystander, could properly assert a cause of action in strict liability.

IV
Defendant urges that the exclusion of the OSHA regulations from evidence should have precluded an opinion by plaintiff's expert that the trailer should properly have been equipped *404 with a back-up alarm. Defendant claims that the expert expressed only a "net opinion." We disagree. The expert's conclusion was based upon actual examination of the tractor and trailer to determine the blockage of vision. Furthermore, he demonstrated an expertise concerning back-up alarms and the necessity for flagmen. His opinion only incidentally related to the admissibility of OSHA regulations and he was clearly familiar with other governmental and safety standards. As required by Evid.R. 19 and 56(2), his opinion was based upon his own "experience, training or education," and he explained how he reached his conclusions, irrespective of the OSHA regulation. We see no net opinion, i.e., a "failure of the expert to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom" based upon a bare conclusion "unsupported by factual evidence." Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). And see Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984).

V
Defendant argues that the Newsweek article found in the jury room had the capacity to influence the verdict, and its presence should have required the trial judge to have granted a new trial.[9] We have no doubt that the Newsweek article found on the jury room table, the substance of which was that manufacturers were failing to provide available safety devices, *405 was objectionable material if read by the jurors during their service on this case. There was no showing, however, that any juror had read the publication, how it found its way into the jury room, whether Mr. Braff had opened the magazine to the article or whether it had already been so opened by a juror, or generally whether there had been any actual taint.
Ordinarily, there should have been an immediate voir dire of the jurors to resolve these issues. Yet we are also moved by the fact that defense counsel during the trial requested no such voir dire, voiced no objection to the magazine remaining in the jury room, and only raised this issue once a substantial jury verdict was returned against defendant. The lack of objection by experienced counsel calls not for an analysis by us to determine whether there was plain error, R. 2:10-2, but rather whether there was invited error. State v. Vaszorich, 13 N.J. 99, 114, 98 A.2d 299 (1953), cert. denied, 346 U.S. 900, 74 S.Ct. 219, 98 L.Ed. 400 (1953); Ench v. Bluestein, 52 N.J. Super. 169, 178, 145 A.2d 44 (App.Div. 1958). Not having expressed an objection at the time, defense counsel was left with potentially reversible error, never called to the judge's attention, remaining in the case, preserved for assertion if a substantial verdict were to be returned, but subject to waiver if a lower verdict ensued.
Given the potential adverse effect of the article, we have reviewed the jury verdict to see if we could discern any substantial effect from the article, if it actually had been read by jurors. First, we see no effect on the liability judgment. The risk/utility factors strongly predominated in favor of plaintiff. In fact, the defect asserted by plaintiff came close to justifying the court's taking the liability issue from the jury. See Johnson v. Salem Corp., 97 N.J. 78, 89, 477 A.2d 1246 (1984). The lack of a back-up alarm on a truck or trailer where rear vision is or could be expected to be obscured has certainly been recognized by the courts as a defect. See e.g., Verge v. Ford Motor Co., 581 F.2d 384 (3rd Cir.1978) (Virgin Island case, citing to New Jersey law); and cf. discussion in Mott v. Callahan Ams Mach. Co., 174 N.J. Super. 202, 207-208, 416 *406 A.2d 57 (App.Div. 1980), cited with approval and modified in Michalko, 91 N.J. at 397, 451 A.2d 179. The fact that the jury found liability only against the trailer manufacturer and not the tractor manufacturer showed that the jury did not automatically assess liability against defendant manufacturers, but rather considered the individual merits of the claims against the two defendants.
As noted infra, the quantum of damage awards also showed no inordinate punishment of defendant. Considering the expert proof of the present value of decedent's earnings, home duties, and the loss of companionship, counsel and guidance suffered by the decedent's family (reimbursable under Green v. Bittner, supra, 85 N.J. at 11-12, 424 A.2d 210), the damages awarded to the children and widow likewise appear to have no punitive aspect.
Under the special situation of this case and the manner in which the issue came before the court, we reject defendant's claim of jury taint based upon the presence of the Newsweek article.

VI
Defendant's final four sub-points relate to the quantum of the verdict. It claims that decedent's coworker, O'Rourke, had been mistakenly permitted to testify concerning decedent's future earnings. Also, defendant objects to the court's charge concerning conscious pain and suffering; asserts that the family photographs admitted into evidence improperly influenced the jury to return an excessive verdict; and lastly, claims that the jury failed to follow the court's charge, and thus returned an excessive award.

A.
It is clear that O'Rourke testified as a lay witness relating the facts surrounding the accident itself, decedent's job history, and his own knowledge of the pay scales relating to *407 oilers and operating engineers working with construction equipment. He also gave his opinion of decedent's probable job progress; but lay opinion is not excluded per se. Evid.R. 56(1) permits such opinions if the judge finds them to "be rationally based on the perception of the witness and ... helpful to a clear understanding of his testimony or to the determination of the fact in issue." The earnings of an operating engineer were known to the witness. He further had perceived decedent's progress as an oiler and assessed his capabilities for advancement. His intentions to recommend decedent as an equipment operator were a statement of his own state of mind, and not an opinion at all, although decedent's capability to do the job and probabilities of acceptance by the union were. From this proper testimony, it was for the jury to conclude whether decedent had a reasonable probability of being promoted and what his then-probable earnings would have been. O'Rourke did no more than testify concerning his observations and his lay opinion reasonably relating thereto. Cf. State v. LaBrutto, 114 N.J. 187, 199-200, 553 A.2d 335 (1989).

B.
The issue of the award for conscious pain and suffering requires little discussion. While it is true that decedent died practically instantaneously after the truck had crushed his chest, there was testimony that he at least raised his head before he died. Defense counsel suggests that this motion was a spasmatic reaction after death, and this might be so. Yet, for some finite period the slowly-moving truck dragged decedent under its wheels and the jury was free to infer that decedent had some brief but distinct anticipation of his impending death as well as physical pain and suffering.

C.
Defendant next posits that the introduction of three family photographs showing decedent with his wife and children *408 improperly inflamed the jury, and impermissibly increased the size of the verdict. It seeks to equate the admission of these photographs with those excluded in Burd v. Vercruyssen, 142 N.J. Super. 344, 355, 361 A.2d 571 (App.Div. 1976), certif. denied, 72 N.J. 459, 371 A.2d 64 (1976). The photographs in Burd involved gruesome photographs of the decedent's body, and the court held that the potential for prejudice outweighed the possible probative value of the photographs. Under Evid.R. 4 the weighing of the elements giving rise to permissible exclusion of otherwise admissible evidence is left to the sound discretion of the trial judge. While there was little in the photographs that had not been learned from plaintiff's testimony, defendant had raised questions concerning the family history. The photographs showed an intact family, verified the closeness of the children's ages, and indicated an apparent bond among the family members. We find no error here.

D.
Lastly, defendant asserts that the $2,550,000 verdict was so against the weight of the evidence as to constitute a miscarriage of justice. Defendant notes that plaintiff's expert had estimated the family's net pecuniary loss as of the time of trial at $104,000, and the most the jury therefore could have awarded for the remainder of decedent's working life was $1,600,000. However, considering the work decedent did around the house and the damages for advice and companionship permitted by Green v. Bittner, supra, the $900,000 additional award, even if split equally among the widow and four children, would yield but $180,000 each for a lifetime's loss of a husband or father. If the jury accepted the fact that decedent would be promoted and potentially would be earning between $65,000 and $80,000 per year, the additional damages become insignificant.
We realize that the net effect of this award is that a family whose chief bread winner was earning approximately $35,000 a *409 year at age 28 will now have $2,550,000 (less fees and disbursements) to invest, with a return, even accounting for inflation, far in excess of what decedent could ever have provided to the family. But, based upon the evidence presented at trial and our current system of damage awards, we cannot say that the jury's assessment was "so disproportionate to the injury and resulting disability shown as to shock [our] conscience and to convince [us] that to sustain the award would be manifestly unjust." Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977). There was no miscarriage of justice under the law. R. 2:10-1.
Affirmed.
NOTES
[1] A similar allegation was made against the manufacturer of the tractor, but the jury determined that the tractor, also manufactured without a back-up alarm, was not defective. No claim was made against the driver of the tractor-trailer, a coemployee of decedent.
[2] Hereafter Rogers Brothers, the trailer manufacturer, will be referred to as defendant.
[3] The expert was also questioned concerning an OSHA regulation, as well as the National Safety Council's suggestion that there be back-up alarms on construction equipment, the Society of Automotive Engineers recommendation in favor of them, and the Corps of Engineers and Bureau of Mines requiring them at construction and mining sites. Yet, since the OSHA regulations imposed a duty on decedent's employer or coemployees, the OSHA regulations were ruled inadmissible. This issue was not pressed, and the questioning was limited.
[4] Plaintiff was permitted to introduce family pictures to corroborate the family situation. Defendants' Evid.R. 4 objection was overruled when the judge admitted the photographs, reasoning that the jury had a right to consider "the personally of the decedent and his relationship with the family." This issue will be discussed in more detail, infra.
[5] N.J.S.A. 2A:58C-1(a) states that the "sponsors' or committee statements ... adopted or included in the legislative history of this act shall be consulted in the interpretation and construction of this act." In discussing sections 2 through 4 of the Act, the Senate Judiciary Committee Statement and the Assembly Insurance Committee Statement provide that the sections were intended to establish clear rules where the court decisions may have created uncertainty "while reserving the concept that manufacturers may be held strictly liable for harm caused by products that are defective." (Emphasis added). Thus, lest there be any thought that the surviving "product liability action" is a negligence or breach of warranty claim, these statements establish that the surviving cause of action is one of strict liability governed by the Act, and, where the Act is inapplicable, the common law.
[6] Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 562, 410 A.2d 674 (1980), is not to the contrary. There, both a strict liability and negligence claim were allowed to proceed to the jury. But the strict liability claim was based upon the retailer's responsibility as the seller of a defective product, while the negligence allegations related to the retailer's separate responsibility for improper installation of the product. In that special situation, both causes of action could proceed to judgment, so long as plaintiff's eventual recovery did not exceed the value of the loss sustained.
[7] The Supreme Court in Suter also noted that in treating the case before it involving an industrial plant machine, it was not "passing upon other situations wherein an employee may similarly be held to have had no meaningful choice." 81 N.J. at 167 n. 5, 406 A.2d 140.
[8] But see Colella v. Safway Steel Products, 201 N.J. Super. 588, 592-593, 493 A.2d 634 (Law Div. 1985) (refusing to apply the Suter protection upon a finding of meaningful choice). Insofar as Colella conflicts with Suter and Crumb, it must be considered overruled.
[9] We note initially that defendant failed to seek leave to expand the record to include the text of the article which nevertheless was reproduced in its appendix. Ordinarily, we would not consider such information. Here, however, counsel for codefendant had placed on the record the name and source of the article, which is readily retrievable from a published source and could well be thought of as incorporated by reference or the subject of judicial notice. Evid.R. 9(2)(e). Rather than our taking the additional time to remand for expansion of the record or requiring a separate motion now to supplement the record, we will take notice of the article and consider the substance of defendant's argument.