## A97A0368. OGLETREE v. NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION.
### (511 SE2d 204)

BEASLEY, Presiding Judge.

Now in its fifth appearance before this Court, this tortured and protracted litigation arising from a 1984 accident involving a cab and chassis manufactured in 1978 conjures up images of the generations-long odyssey of Jarndyce v. Jarndyce of *Bleak House* fame: "And thus, through years and years, and lives and lives, everything goes on, constantly beginning over and over again, and nothing ever ends. And we can't get out of the suit on any terms, for we are made parties to it, and must be parties to it, whether we like it or not."[1] The law sometimes weaves its garment painstakingly slowly.

### Factual Background

Dickens' lament notwithstanding, we address the task at hand. We recap the facts from *Ogletree v. Navistar Intl. Transp. Corp.*[2] "On March 10, 1984, Campbell drove his fertilizer spreader truck to Colbert Seed Company to pick up a load of ammonia nitrate. The fertilizer was located in a compartmentalized bulk-transport trailer called a 'Killebrew' which required off-loading from the side. The Killebrew was equipped with a hydraulic motor to transfer its contained material to the transport vehicle, which motor could be quite loud.

"The decedent, a salesman for an agricultural supply company, met Campbell at the seed company and rode on the running board of Campbell's truck to the area where the Killebrews were located. The decedent located the correct Killebrew, told Campbell, and disappeared from Campbell's view. Campbell pulled up and, aided by his rearview mirrors, began to back around to come up alongside a Killebrew different from the one designated by the decedent. Having turned his back to the approaching vehicle, the decedent was stand-

---

[1] Charles Dickens, *Bleak House* 146 (Penguin 1971).
[2] 227 Ga. App. 11-12 (488 SE2d 97) (1997).

ing at the presenting end of the correct Killebrew; its engine was probably running. Campbell's view of the decedent being blocked by the fertilizer spreader body, Campbell struck and killed the decedent as Campbell mistakenly backed his truck up to the adjacent Killebrew.

"Defendant Navistar International Transportation Corporation's corporate predecessor manufactured the cab and chassis of the vehicle in 1978 and sold same to Penske Leasing. At that time, audible back-up alarms were available as optional equipment on the cab and chassis, but Penske did not request such a device, and one was not installed. Penske then had a van body installed on the vehicle, used the truck for some years, and then sold same to a Chevrolet dealership, which in turn sold the truck to Campbell. At Campbell's request, the dealership removed the van body before delivering it to him. After having a repair facility shorten the chassis and frame rail of the vehicle, Campbell employed Newton Crouch, Inc. to mount a fertilizer spreader body on the chassis. No back-up alarm was added at any time, and the vehicle did not have an alarm when it struck Ogletree. In approximately 20 years of being in the fertilizer business, Campbell had never seen a fertilizer spreader with a back-up alarm, nor had any other witness (expert or otherwise) who testified at trial."

## Procedural Background

Mrs. Ogletree, individually and as administratrix, sued Navistar for product liability, alleging a design defect in Navistar's failure to install an audible back-up alarm as standard equipment on the original chassis. The court granted summary judgment to Navistar, reasoning that the absence of the back-up alarm was open and obvious.

In *Ogletree v. Navistar Intl. Transp. Corp.*[3] (*"Ogletree I"*) we reversed the grant of summary judgment to Navistar, holding the "open and obvious" rule inapplicable because Navistar did not establish that decedent subjectively knew of the immediate hazard or appreciated the danger he was in as the truck backed up. Four months later *Weatherby v. Honda Motor Co.*[4] overruled *Ogletree I*, holding that to apply the open and obvious rule the injured party did not need to know subjectively of the danger but only objectively should have known. *Weatherby* specifically held summary judgment should have been granted to Navistar.[5]

---

[3] 194 Ga. App. 41, 44-45 (1) (390 SE2d 61) (1989).
[4] 195 Ga. App. 169 (393 SE2d 64) (1990), overruled, *Ogletree v. Navistar Intl. Transp. Corp.*, 269 Ga. 443 (500 SE2d 570) (1998).
[5] Id. at 172.

*Navistar Intl. Transp. Corp. v. Ogletree*[6] ("*Ogletree II*") then held that under the law of the case rule, Navistar could not again seek summary judgment based on *Weatherby* unless the evidentiary posture of the case had changed, which it had not.

A jury awarded Ogletree funeral and medical expenses only, with nothing for the life of the decedent or for pain and suffering. The court denied Ogletree's motion for new trial, granted Navistar's j.n.o.v. motion, and did not rule on Navistar's conditional motion for new trial. Both parties appealed, and in *Ogletree v. Navistar Intl. Transp. Corp.*[7] ("*Ogletree III*") we remanded the matter for a ruling on Navistar's conditional motion for new trial. The trial court denied that motion.

*Ogletree v. Navistar Intl. Transp. Corp.*[8] ("*Ogletree IV*") held that the evidence at trial was materially different from that submitted on the earlier motion for summary judgment, and therefore the open and obvious rule discussed in *Weatherby* controlled to require j.n.o.v. in Navistar's favor.

The Supreme Court reversed in *Ogletree v. Navistar Intl. Transp. Corp.*[9] ("*Ogletree V*"), holding that *Banks v. ICI Americas*[10] had implicitly overruled *Weatherby* and the "open and obvious" rule followed therein. The Court held that in adopting the risk-utility analysis for determining whether a product was defectively designed, *Banks* enumerated numerous factors, of which the patency of the defect was but one and was not alone determinative.[11] The matter has now been remanded to us.

1. As we stated in *Ogletree IV*, "[t]he j.n.o.v. motion set forth three separate and independent grounds: (1) the law of the case rule no longer applied [and thus the *Weatherby* ruling controlled]; (2) there was no evidence that Navistar was negligent in its design and manufacture of the cab and chassis; and (3) any possible defect in the design was not a proximate cause of the damages sustained."[12] Because we affirmed on the first ground, we did not reach the second or third ground. Having been reversed on the first ground, we now address the second ground and affirm on that basis.

The question of negligent or defective design need not always be decided by the jury. The burden is on the plaintiff to present evidence that the manufacturer acted negligently, by showing the risks inherent in a product design outweigh the utility or benefit derived from

---

[6] 199 Ga. App. 699 (405 SE2d 884) (1991).
[7] 221 Ga. App. 363 (471 SE2d 287) (1996).
[8] 227 Ga. App. 11, supra.
[9] 269 Ga. 443, supra.
[10] 264 Ga. 732 (450 SE2d 671) (1994).
[11] See *Bodymasters Sports Indus. v. Wimberley*, 232 Ga. App. 170 (501 SE2d 556) (1998).
[12] 227 Ga. App. at 14.

the product. "This risk-utility analysis incorporates the concept of 'reasonableness,' i.e., whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk.

" 'When a jury decides that the risk of harm outweighs the utility of a particular design (that the product is not as safe as it should be), it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to greater risk of danger than he should have. Conceptually and analytically, this approach bespeaks negligence.' "[13]

Thus, the general negligence principles discussed in *Ogletree I* apply. *Ogletree I* cited OCGA § 51-1-2, which provides that "ordinary diligence is that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances. . . . The absence of such diligence is termed ordinary negligence."[14] To obtain summary judgment, *Ogletree I* held that Navistar had to show "as a matter of law that an ordinarily prudent manufacturer would not install the alarm."[15] Relevant to the inquiry were "the trade custom and industry practice" and the foreseeability of this harm.[16] *Banks* pointed out that "a manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its liability for its design of allegedly defective products."[17] Nevertheless, "[t]hat is not to say that evidence of such compliance is not significant, for it is. But, instead of acting as an impenetrable shield from liability, compliance, more appropriately, is to be a piece of the evidentiary puzzle."[18]

With these principles in mind, we turn to the undisputed evidence. It demonstrates that (a) no fertilizer spreader vehicle has ever had a back-up alarm; (b) no government regulation, industry standard, trade custom, industry practice, nor industry study requires nor recommends a back-up alarm on this vehicle; (c) the industry practice is that original manufacturers do not install back-up alarms as standard equipment on cab and chassis units; (d) the industry practice is also that the body builder or the final stage manufacturer will install back-up alarms where needed or requested by the customer; (e) there was no evidence that a fertilizer spreader had previ-

---

[13] (Citation omitted.) *Banks*, supra, 264 Ga. at 734.
[14] 194 Ga. App. at 46.
[15] Id. at 48.
[16] Id. at 48-49.
[17] 264 Ga. at 737, fn. 6.
[18] *Doyle v. Volkswagenwerk Aktiengesellschaft*, 267 Ga. 574, 577 (481 SE2d 518) (1997).

ously injured someone while backing up; (f) the operation of a fertilizer spreader truck rarely involves backing up, for the spreader will not work unless the truck is going forward; (g) the normal operation of a fertilizer spreader is in a rural environment with no people around; (h) a wide variety of bodies could have been placed on the cab and chassis at issue, some of which would have no need for a back-up alarm and some of which require that alarms be placed on the truck body, not the chassis;[19] (i) at the time Navistar sold the cab and chassis to Penske, Navistar offered a back-up alarm option, which Penske chose not to accept; and (j) the absence of a back-up alarm was apparent to the decedent and to the public at large. Under such undisputed evidence, Navistar was not negligent in failing to install a back-up alarm on a cab and chassis that years later were substantially modified and used for a fertilizer spreader vehicle.

2. Beyond this application of general negligence principles, the ostensibly universal factors listed in footnote six of *Banks* negate any possible finding of defective design.[20] We address each applicable factor.

(a) The cab and chassis without the alarm were highly serviceable and could be used for a variety of truck vehicles that did not need the alarm.

(b) The danger was easily avoidable in that the owner could have accepted the option of installing an alarm, and the owner and the decedent, who had assisted in back-up maneuvers, were both familiar with the truck's patent lack of an alarm and aware of the dangers.

(c) The owner had the ability to avoid the danger by choosing to have the alarm installed, and the decedent could have avoided the danger by not turning his back on the vehicle as it was about to back up.

(d) The state of the art at the time the vehicle was manufactured was that manufacturers offered the back-up alarms as an option but did not place one on the cab and chassis as standard equipment because the cab and chassis could be used for purposes where such was not indicated; the final stage manufacturer was in the best position to determine the need for and placement of the alarm.

(e) The ability to eliminate the danger without impairing the usefulness of the product was limited, for the installation of an alarm on vehicles operating in the early morning hours in residential areas caused complaints and were sometimes disconnected. In addition, if the chassis had to be shortened or modified, as was commonly done and as was done here, the alarm would have to be removed or relo-

---

[19] See *Verge v. Ford Motor Co.*, 581 F2d 384, 388 (3) (3rd Cir. 1978).
[20] 264 Ga. at 736-737, fn. 6.

cated. The alarm's price of $25 to $50 plus installation could be put in the cab and chassis' price but would appear to be an impractical waste of resources until the final design of the vehicle was determined. Here the cab and chassis were in fact used for varying purposes depending on the successive owners' needs.

(f) Navistar complied completely with industry-wide practices, state of the art, and federal regulations.

(g) The alternative design of requiring an alarm on all cab/chassis units was feasible but highly questionable until the customer decided the use of the cab and chassis and had them modified and a body attached. It was the nature of the body that determined the need for an alarm. The installation of an alarm by the body builder after the modifications was the sensible industry practice.

(h) The multi-purpose use of the cab and chassis dictated the later installation if needed.

(i) The length of time the cab and chassis could be used without harm was demonstrated here where they were manufactured in 1978, went through multiple uses and modifications, and the accident did not occur until 1984, which was the first time an accident of a fertilizer spreader backing into a person had been recorded.

In view of these undisputed facts, Ogletree failed to present evidence that would support a finding that the risk of the cab and chassis without the alarm outweighed the usefulness of the product in that condition.

All jurisdictions but one are consistent. The seminal case of *Verge v. Ford Motor Co.*[21] held "it is considerably more practical for warning devices to be installed by [the final stage manufacturer] rather than by [the cab-chassis manufacturer]. It is essential to recognize that . . . the Ford cab and chassis was a multi-purpose vehicle. As such, the topless chassis could be modified for a number of uses that would require no backup buzzer. Thus, if a flat bed were added that allowed unobstructed rear vision, it is difficult to conceive of a legal basis for finding that the absence of a warning device would constitute a design defect. Similarly, if a body were added that was lower than the rear view window or if a body were added that otherwise allowed adequate rear vision, there would be no basis for finding that a design defect was present because of the failure to incorporate a backup buzzer. Thus, we are dealing with a vehicle that was not inherently defective when manufactured, but that became defective solely because of additions made by a company with decades of experience in accomplishing just this type of modification." *Verge* held the defendant was entitled to j.n.o.v. For similar reasons, at

---

[21] Supra, 581 F2d at 388-389.

least eight other cases involving the absence of back-up alarms have ruled in favor of cab/chassis manufacturers as a matter of law.[22] Two of these cases also found significant that, as here, the cab manufacturer offered the back-up alarm as an option, which the buyer declined.[23]

Cases from other jurisdictions employing the risk/utility analysis have often found that a manufacturer who offers the missing safety device as an option, which the buyer rejected, cannot be held liable for design defect, if the product alone was not inherently dangerous.[24] The same is true for cases relying on common law principles

---

[22] See *Pietluck v. Danella Cos.*, 1993 WL 57194 (U.S.D.C. E.D. Pa. 1993) (summary judgment); *Shaw v. Gen. Motors Corp.*, 727 P2d 387 (Colo. App. 1986) (summary judgment); *Ford v. Intl. Harvester Co.*, 430 S2d 912 (Fla. Dist. Ct. App. 1983) (directed verdict); *Scarangello v. Thomas Built Buses*, ___ NYS2d ___, 1998 WL 250348 (App. Div. May 11, 1998) (motion in limine); *Patane v. Thompson & Johnson Equip. Co.*, 649 NYS2d 547 (App. Div. 1996) (summary judgment); *Gray v. Navistar Intl. Corp.*, 630 NYS2d 596 (App. Div. 1995) (summary judgment); *Paul v. Ford Motor Co.*, 607 NYS2d 90 (App. Div. 1994) (summary judgment); *Elliott v. Century Chevrolet Co.*, 597 SW2d 563 (Tex. App. 1980) (summary judgment); cf. *Kochin v. Eaton*, 1993 WL 44816 (U.S. Ct. App. 7th Cir. 1993) (unpublished decision; jury verdict for manufacturer); *Field v. Omaha Standard*, 582 FSupp. 323, 326-327 (E.D. Pa. 1983) ("cab-chassis by itself was nothing more than a component of the finished product"; jury verdict for manufacturer), aff'd, 732 F2d 145 (3rd Cir. 1984); *Tirrell v. Navistar Intl.*, 591 A2d 643 (N.J. Super. Ct. App. Div. 1991) (jury verdict in favor of cab manufacturer). See generally Restatement (Third) of Torts: Product Liability, § 5, Comment d (1997) ("The chassis of a truck can be put to a variety of different uses. A truck chassis may ultimately be used with a cement mixer or a garbage compaction unit or in a flat-bed truck. . . . A seller ordinarily is not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another utilizes the incomplete product. A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation"). But see *Childers v. Joseph*, 842 F2d 689, 697 (3rd Cir. 1988) (question of lack of back-up alarm should have been submitted to jury); *Fernandez v. Ford Motor Co.*, 879 P2d 101, 113 (N.M. App. 1994) (jury question; distinguishes *Verge* on grounds trailer was not permanently attached to tractor chassis and thus Ford was considered final manufacturer).

[23] *Scarangello*, supra; *Patane*, supra.

[24] See *Scallan v. Duriron Co.*, 11 F3d 1249, 1254 (5th Cir. 1994) (the purchaser "was in a much better position than [the manufacturer] to evaluate the various warning devices"); *Pahuta v. Massey-Ferguson, Inc.*, 942 FSupp. 161, 166 (W.D. N.Y. 1996) ("where an inherently safe product is subject to widely varied applications that may increase its danger, the duty to use reasonable care in selecting optional equipment appropriate to the intended use should rest with the purchaser"); *Scoby v. Vulcan-Hart Corp.*, 569 NE2d 1147 (Ill. App. 1991); *Cooper v. Gen. Motors Corp.*, 702 S2d 428, 444 (Miss. 1997) ("[p]ut simply, if the Coopers wanted a car with an air bag, they should have purchased a car with an air bag. If you want it, then pay for it"); *Pigliavento v. Tyler Equip. Corp.*, 669 NYS2d 747 (App. Div. 1998); *Jackson v. Bomag GmbH*, 638 NYS2d 819, 823 (App. Div. 1996) ("Bomag fulfilled its duty of reasonable care when it designed the product with the . . . safety option and thereafter made such option available to the consumer, who was in the better position to assess its need in light of the use for which it was purchased"); *Fallon v. Clifford B. Hannay & Son, Inc.*, 550 NYS2d 135, 138 (App. Div. 1989) (because purchasers were in better position to assess need for safety device, "defendant's proof supported the conclusion that the reel alone was reasonably safe and that defendant satisfied its duty not to market a defective product by giving purchasers the option to buy its reel with or without the [device]"). But see *Cremeans v. Intl. Harvester Co.*, 452 NE2d 1281 (Ohio 1983) (summary judgment reversed even though manufacturer offered safety device as option); *Heliciod Gage Div. &c. v. Howell*,

of negligence.[25]

Based on this second ground, the court did not err in granting j.n.o.v. As in *Ogletree IV*, this moots all other enumerations of error. Perhaps the saga, unfortunate for all parties, is at an end.

*Judgment affirmed. McMurray, P. J., and Smith, J., concur.*

DECIDED JANUARY 26, 1999 — ▆▆▆▆▆▆▆▆

*Winburn, Lewis & Barrow, Gene Mac Winburn, John J. Barrow*, for appellant.

*Nelson, Mullins, Riley & Scarborough, Richard B. North, Jr., Jeffrey S. Burton, Tara R. Simkins*, for appellee.

---

511 SW2d 573 (Tex. App. 1974) (jury verdict against manufacturer sustained). Compare *Bilotta v. Kelley Co.*, 346 NW2d 616, 624 (Minn. 1984) (product was not multi-use; offering safety option did not excuse manufacturer) and *Hopper v. Crown*, 646 S2d 933, 945 (La. App. 1994) (summary judgment reversed where safety device not offered as option).

[25] See *Morrison v. Kubota Tractor Corp.*, 891 SW2d 422, 428 (Mo. App. 1994) (manufacturer fulfilled duty when it offered device as option); *Biss v. Tenneco, Inc.*, 409 NYS2d 874, 876 (App. Div. 1978) ("defendants had fulfilled their duty to exercise reasonable skill and care in designing the product as a matter of law when they advised the purchaser that an appropriate safety structure for the [product] was available").