266 N.J. Super. 481 (1993)
630 A.2d 308
GERTRUDE LADNER AND DAVID LADNER, PLAINTIFFS-APPELLANTS,
v.
MERCEDES-BENZ OF NORTH AMERICA, INC., AND DAIMLER-BENZ AKTIENGESELLSCHAFT, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1993.
Decided July 28, 1993.
*484 Before Judges PETRELLA, LONG and KEEFE.
Bruce H. Nagel argued the cause for appellants (Nagel and Rice, attorneys; David A. Mazie on the brief).
Jerome J. Graham, Jr. argued the cause for respondents (Ribis, Graham & Curtin, attorneys; George C. Jones on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiffs Gertrude and David Ladner appeal from an adverse jury verdict in their product liability and breach of express warranty action against Mercedes-Benz of North America, Inc. *485 and Daimler-Benz Aktiengesellschaft (hereinafter Mercedes).[1] Mrs. Ladner[2] was injured when she attempted to stop her 1983 Mercedes 300D as it began to roll slowly down a street in Wallington, New Jersey.
Plaintiffs' theory at trial was that the gear shift mechanism on the vehicle was defectively designed, and that the warnings and instructions accompanying the vehicle were inadequate. Further, plaintiffs contended that Mercedes had breached certain express warranties made in connection with the purchase of the vehicle. Mercedes denied the allegations, and contended that plaintiff's conduct, rather than any defect in the vehicle, was the sole proximate cause of the accident.
By way of answers to special interrogatories, a jury determined that the gear shift mechanism was not defective by reason of its design; the warnings and instructions accompanying the vehicle were not defective; Mercedes breached no express warranty; and plaintiff voluntarily and unreasonably encountered a known risk when she returned to her vehicle and attempted to stop it. Plaintiffs now appeal from that verdict and raise multiple issues for determination.
We affirm substantially all of the judgment under review except for that part of the verdict which addressed the design defect in the gear shift mechanism. As to that issue, we conclude that the jury instructions were in error, and had the capacity to produce an erroneous result. Thus, for the reasons stated herein, we remand the matter for a new trial limited solely to the issue of design defect of the gear shift mechanism.
The 1983 Mercedes 300D involved in this incident was owned by the G & S Specialty Corporation, a plumbing supply operation in Wallington, New Jersey, of which plaintiff was both president and *486 owner. Plaintiff claimed that she bought the car on behalf of her company, in reliance on brochures and advertisements she had seen while shopping for a car, and because of the Mercedes slogan that the car was "engineered like no other car in the world." Plaintiff interpreted this slogan to mean that the vehicle was safe. She testified that she read the Owner's Manual "from cover to cover" when she first bought the car, including the section which read:
When parking the vehicle, or if working on the vehicle with the engine running, depress parking brake pedal and move selector lever to position "P."
On the evening of the accident, July 12, 1988,[3] plaintiff worked until almost nine o'clock p.m. Upon leaving her business, she decided to stop at a diner in Wallington to have a cup of coffee before going home. She parked the vehicle along a section of Patterson Avenue which she perceived as "basically flat," but which defendant's expert described as "quite obviously a downgrade."
The gear shift lever on the 300D is in a floor mounted console. It moves from one gear to another through a series of flats and grooves, or detents, in what is called a "jigsaw pattern." Plaintiff testified that because of this system, placing the car into "park" requires two movements; one to push the lever up to the park position (through reverse), and another to slip it into the park groove. The second movement is assisted by a spring, which has the effect of pulling the lever toward the notch and keeping it there.
Plaintiff testified that she thought she had put the car in park when she stopped, but was not sure that she had done so. Plaintiff then claims to have removed the key from the ignition, tucked her purse under her left arm, and exited the vehicle. She did not believe that her purse caught on anything as she picked it *487 up to leave the car.[4] Plaintiff acknowledged that she did not engage the parking brake that night, although she normally did so because the car "rolls a lot when you put it in park[.]" She did not remember whether she turned her wheels toward the side of the road.
After getting out of the car, plaintiff walked to the rear of the vehicle. From that vantage point, she saw the car begin to roll very slowly down Paterson Avenue. She decided to try to stop the rolling vehicle, even though she knew that there was nothing in close proximity to the front of the car. In her attempt to halt the car, plaintiff opened the driver's door and stepped on the brake pedal from outside the car. She lost her balance and fell, whereupon the left rear wheel of the car ran over her legs. The vehicle came to rest at the side of a building further down Paterson Avenue.
Plaintiffs' expert, Dr. I. Robert Ehrlich, testified extensively with regard to the "false park" syndrome, and its impact on the automobile industry prior to 1983. He defined the "false park" scenario as one where the gear shift becomes hung up inadvertently between the "reverse" and the "park" gears. Because there is so little space between the two gears in most gear shift designs, the shift lever appears to be in park when it is not. The danger of "false park" occurs when the gear shift does not drop into the park position, but either falls into the reverse position, allowing the car to inadvertently roll backward, or remains between reverse and park, essentially leaving the car in a neutral position, and allowing it to roll in either direction.
Dr. Ehrlich testified that the auto industry had designed a button mechanism and an interlock mechanism to prevent the false park phenomenon. The button system forces the driver to depress a button on the gear shift knob, in order to move the shift *488 into or out of park. The driver can feel the button pop, and thus has a tactile sensation that the switching of gears has been completed. The ignition interlock, on the other hand, simply does not allow the ignition key to be removed unless the shift is actually in the park position. Although the latter design appeared most frequently on cars with the shifting mechanism on the steering column, he opined that it could have been installed on console mount gear shifts, such as plaintiff's Mercedes.
Dr. Ehrlich criticized the Mercedes design for having neither the button nor the interlock safety feature, and testified that the cost of incorporating both safety features in the Mercedes would have been between $7 and $70. He cited his own 1983 Chrysler Le Baron, equipped with the button system, as an example of a safely designed console gear mechanism.
Finally, Dr. Ehrlich opined that the spring which held the Mercedes gear shift in place was too weak, allowing for the gear shift to be easily pulled out of place, although he did not know of any facts indicating that plaintiff had in fact inadvertently pulled the gear shift out of park.[5]
Plaintiffs also called a Mercedes engineer, Axel Stehle, as a witness. He testified that car manufacturers had installed the ignition interlock system described by Dr. Ehrlich as a means of complying with a federal anti-theft statute. He noted that Mercedes had chosen to comply with that statute by implementing a system whereby the steering wheel locks once the driver takes out the ignition key, thus prohibiting the car from being steered without insertion of the key. Mr. Stehle gratuitously told the jury, however, that Mercedes installed the ignition interlock in 1990 model cars. He also indicated that, prior to plaintiff's accident, Mercedes had been made aware of certain incidents where inadvertent gear shift movement allegedly occurred, but had decided at that point not to issue any warnings or install any additional safety equipment.
*489 Dr. Kenneth Packer, defendant's expert, testified that the gear shift configuration in the Mercedes was not the "rooster comb" design which permits the appearance of false park about which Dr. Ehrlich had testified, but was a completely different jigsaw configuration. Although a Mercedes driver could potentially place the gear shift between reverse and park, it would not, to the observant driver, give the illusion of being in park, i.e. "false park." Rather, upon inspection, the gear shift would simply appear to be between reverse and park. As such, he testified, the Mercedes 300D could not be subject to the phenomenon of false park.
Dr. Packer further noted that the Mercedes actually gave greater tactile feedback as to whether it was actually in park than did Dr. Ehrlich's Chrysler, because the Mercedes shift required two motions, both pushing up and pushing over (with the spring assist in the latter movement), in order to get the shift into park, while the Chrysler required only that the lever be pushed straight up. He also pointed out that the Mercedes 300D, like Dr. Ehrlich's 1983 Chrysler, was not equipped with an ignition interlock, and opined that such design was not necessary to make the car safer.
He noted that the 300D, like all autos, was designed with the driver as an important part of its system, and that a driver using reasonable care had the ability to park the 300D safely, by putting the car in park and engaging the parking brake. As such, he opined that the 300D was properly designed.

I
Mercedes did not claim that plaintiff misused the product, nor did it deny the feasibility of the alternative designs advanced by plaintiff. Its defense theory was that Mercedes intended the parking brake to be the primary mechanism for preventing a parked vehicle from rolling down a grade; the drivers' manual so instructs a Mercedes owner; the plaintiff acknowledged being aware of the instruction; and the average motor vehicle user also *490 understands that to be the case, as evidenced by the New Jersey motor vehicle statute requiring parking brakes to be set.
Mercedes defense, thus, implied that the gear shift mechanism, and the "park" gear specifically, in essence, was a fail-safe mechanism, providing the operator with a second way to prevent the car from rolling when parked. Mercedes contended that its gear shift lever transmits a tactile message, or "feel," to the driver when the lever is properly placed in the park position, and, is every bit as good as the Chrysler Le Baron design plaintiffs' expert found acceptable. Additionally, Mercedes contended that, if the driver actually looked at the shift mechanism and did not rely on feel, the driver would see that the shift was in or out of park. Mercedes argued that no illusion or "false park" phenomenon is created by the design of its gear shift mechanism. In essence, Mercedes contended that, in light of the gear shift lever's secondary role, the gear shift was reasonably and safely designed.
By conceding that plaintiff had not misused the vehicle, Mercedes was accepting the corollary proposition that the manner in which plaintiff used the vehicle on the day in question was foreseeable, i.e., that it knew or should have known that plaintiff, and other operators, would, on occasion, not apply the parking brake, and would not fully engage the park gear.
In a strict liability construct, the inquiry in such circumstances becomes "whether, given that knowledge, a reasonably prudent manufacturer nevertheless would have placed the product on the market." Johansen v. Makita, USA, Inc., 128 N.J. 86, 95, 607 A.2d 637 (1992). Once knowledge of the foreseeability of the manner of use to which plaintiff put the product is imputed to defendant, the analysis becomes very similar to a negligence case. Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 171, 406 A.2d 140 (1979).
To aid the jury in its determination of whether a manufacturer acted reasonably in marketing the product under the circumstances, certain risk/utility factors were formulated for the jury's consideration when evidence relevant to those factors is offered. *491 Cepeda v. Cumberland Engineering Company, Inc., 76 N.J. 152, 173-74, 386 A.2d 816 (1978), overruled on otr. grounds, 81 N.J. at 177, 406 A.2d 140 (1979).[6] The purpose of the analysis is to determine whether the risks inherent in the use of the product outweigh the product's utility, with due consideration being given to the cost of making the product safer (nominal in this case), and the impact such changes would have on the product's utility (no impact in this case).
Of course, the defect must be proven as of the date the product left the manufacturer's control. For that reason, "the post-marketing conduct of one plaintiff cannot inform that determination." Johansen, supra, 128 N.J. at 101, 607 A.2d 637. Stated more simply, plaintiff's conduct in failing to engage park and apply the parking brake is irrelevant in determining whether there was a design defect in the context of the risk/utility analysis. That concept, though recently articulated in Johansen, which was decided after this case was tried, can hardly be considered new law. It is merely a statement of common sense. No one can seriously argue that plaintiff's conduct in July, 1988 had any relevance to the question of whether her 1983 Mercedes was defective when it was marketed in 1982.
In this case, plaintiff's first claim of error focuses on the trial judge's instruction on risk/utility factor # 5  "The user's ability to avoid danger by the exercise of care in the use of the product." See, Cepeda, supra 76 N.J. at 174, 386 A.2d 816. In that respect, Mercedes' expert on cross-examination, addressing design considerations, stated:
Well, you know, not everybody is the same, and not all drivers are the same, and people come in various sizes and shapes, those are taken into account, and to the *492 degree possible, the automobile designers take into account the expected behavior in the envelope of behavior of drivers of vehicles.
Mercedes offered N.J.S.A. 39:4-137 as the type of objective driver behavior that was relevant to this factor. The trial judge's instructions on the issue were:
Fifth, the ability of foreseeable users to avoid danger by the exercise of care in the use of the product.
Now, in this regard, in this case, the defendant takes the position that you should be aware of the Motor Vehicle and Traffic Act provision which reads as follows. This is N.J.S.A. 39:4-137, and I quote:
"No person having control or charge of a motor vehicle shall allow it to stand on a highway unattended without first effectively setting the brakes thereon and stopping the motor thereof, and when standing on a grade without turning the wheels thereof to the curb or side of the highway."
Now, this statute sets up standards of conduct for users of our streets and highways. I am instructing you regarding this statute only insofar as it may assist you in applying this risk utility test that I've referred to in determining whether there was a design defect in the motor vehicle.
Plaintiff maintains that the instruction violates the Johansen principle because it necessarily focused the jury on plaintiff's conduct, and invited the jury to compare plaintiff's conduct against the statutory standard in deciding whether the design of the gear shift was correct.
Mercedes counters that argument by observing that "[t]he jury was never told to consider Mrs. Ladner's own conduct under N.J.S.A. 39:4-137 in performing the risk-utility analysis." Mercedes' observation is correct as far as it goes. However, much was made of plaintiff's conduct throughout the trial and in defense counsel's summation. The invitation to compare the statutory standard to plaintiff's conduct, if not express, was clearly implied.
The judge told the jury that they could use the statute only in the context of the fifth risk/utility factor. However, that factor, as read to the jury, refers to "the ability of foreseeable users to avoid danger by the exercise of care in the use of the product." (Emphasis added). The jury was not instructed that the factor referred to hypothetical foreseeable user conduct upon which Mercedes claimed a right to rely at the time it designed the 300D. Without that explanation, the jury was free to reason that plaintiff *493 was a foreseeable user; the standard of care applied to her; she violated the standard; and she would not have been injured had she not done so: ergo, the Mercedes design was not defective.
We cannot, of course, be certain that the jury used plaintiff's conduct improperly in the risk/utility analysis. However, our conclusion that it probably did so in this case is not the product of whimsical conjecture on our part. It is clear to us that the trial judge believed plaintiff's conduct was relevant in the risk/utility analysis, and intended his instructions to have the effect on the jury we now conclude it had the capacity to produce.
On one occasion in discussing the proposed charge with counsel, and specifically plaintiff's conduct, the judge said:
Let me say this. That her conduct does have a bearing on the risk utility analysis, therefore, I can't tell them they cannot consider them. (sic).
Later, in addressing plaintiffs' counsel's objection to the charge, and counsel's reliance on Siren v. Behan, 224 N.J. Super. 130, 539 A.2d 1244 (App.Div.), certif. granted and summarily remanded 113 N.J. 323, 550 A.2d 442 (1988), the judge said:
I believe I made it clear to the jury that in connection with the risk utility analysis they may consider the plaintiff's failure to apply the parking brake and turn the wheels toward the curb.
Clearly, the trial judge believed his instruction invited the jury to consider plaintiff's failure to apply the parking brake and turn the wheels toward the curb. If the trial judge erroneously believed that plaintiff's conduct was relevant on the fifth risk/utility factor, and instructed the jury regarding N.J.S.A. 39:4-137 with that in mind, we think it more likely than not that the jury also believed plaintiff's failure to set the parking brake and turn the wheels to the curb was important in determining whether the 300D was defectively designed.
Johansen makes it clear that when evidence is offered concerning conduct of the "average user" in connection with the fifth risk/utility factor, "an instruction that the plaintiff's conduct not be considered in the context of the risk/utility analysis is essential." 128 N.J. at 101, 607 A.2d 637 (Emphasis added). A *494 limiting instruction is necessary because "a jury not properly instructed might inadvertently compare a plaintiff's and defendant's fault in determining whether a product is defectively designed." Id. The importance of providing a limiting instruction when plaintiff's conduct is admissible on some issues but not others was well established before Johansen. See Evid.R. 6 and Siren v. Behan, supra. (in a product liability context).
We cannot conclude the error in failing to provide the limiting instruction was harmless in view of the plaintiff's objections, and the Johansen court's determination that such an instruction is "essential." It may very well be that a jury properly instructed could find, notwithstanding the provisions of N.J.S.A. 39:4-137, that the actual conduct of the average hypothetical driver is not to use the parking brake in most circumstances. If such were the case, the jury could then conclude that Mercedes' reliance on assumed conduct was misplaced, and Mercedes should have given more thought to the design of the park gear as the primary parking brake. We are not suggesting that such is the preferred result. We merely indicate by this example that the jury in this case was precluded from making such an analysis because it was not told that the statutory standard was an example of hypothetical user conduct and had to be considered without reference to plaintiff's actual conduct.
Thus, we are constrained to reverse and order a new trial on the issue of design defect.

II
Plaintiff contends that the trial judge erred in submitting her comparative fault to the jury, essentially because "[s]he had absolutely no idea that the car was moving because the gear shift mechanism was defective[.]"
The type of conduct that is admissible in a strict liability setting to establish plaintiff's comparative fault "has been sharply circumscribed." Cartel Capital Corp. v. Fierco of New Jersey, 81 *495 N.J. 548, 562, 410 A.2d 674 (1980). However, plaintiff's fault is a defense when there is evidence that "plaintiff with actual knowledge of the danger posed by the defective product voluntarily and unreasonably encountered that risk." Id. at 562-63, 410 A.2d 674. It is not knowledge of the defect, as plaintiff suggests in her brief, that is required to be proven, but, rather, evidence that plaintiff voluntarily and unreasonably encountered a known danger. Crumb v. Black & Decker, 204 N.J. Super. 521, 529, 499 A.2d 530 (App.Div. 1985). In Cintrone v. Hertz Truck Leasing, 45 N.J. 434, 212 A.2d 769 (1965) the Court held that plaintiff's conduct was properly submitted to the jury where there was evidence that plaintiff was aware that the brakes were not working properly for three days of the week previous to the accident. The court concluded from the evidence that a
jury could have concluded the brakes were defective, that Cintrone knew it for some days before the accident but neglected to report the condition, and that with such knowledge he rode in the loaded truck for several hours until the brakes failed and caused the truck to collide with the overhead structure. On such a finding an ultimate conclusion was possible, i.e. that Cintrone with knowledge of the danger presented by the defective brakes failed to take the care for his own safety which a reasonably prudent person would have taken under the circumstances.

[Id. at 459, 212 A.2d 769.]
Recently, our Supreme Court has addressed this very issue and observed:
When a plaintiff with actual knowledge of the danger presented by a defective product knowingly and voluntarily encounters that risk, a trial court should submit the comparative-negligence defense to a jury.
[Johansen, supra, 128 N.J. at 94, 607 A.2d 637. (emphasis added.)]
In order to ascertain whether plaintiff's conduct was admissible on the issue of her comparative fault, it is necessary to "examine the particular risk that plaintiff is claimed to have assumed." Crumb, supra, 204 N.J. Super. at 530, 499 A.2d 530. Stated succinctly, the danger that plaintiff appreciated was that her vehicle "rolls a lot when you put it in park[.]" In view of that knowledge, and in appreciation of the fact that the car was, in her terms, a "monster," plaintiff testified that she used the parking brake "most of the time." A jury could reasonably conclude from *496 this record that plaintiff alighted from the car on the date in question without applying the parking brake.
Although it could be reasonably argued, applying the Cintrone construct, that such evidence was sufficient for a jury to determine that plaintiff, with full knowledge of the danger presented by a rolling vehicle, failed to take care for her own safety by applying the parking brake before leaving the vehicle, the trial judge specifically instructed the jury not to consider that conduct in terms of plaintiff's comparative fault. Defendant does not appeal from that decision. We comment on it only to highlight the factual background for the conduct which the judge did permit the jury to consider with reference to the plaintiff's fault, and to observe that what we feel is a close question was resolved in plaintiff's favor.
However, the trial judge instructed the jury that it could consider plaintiff's conduct, commencing with her observation of the vehicle rolling forward and her decision to attempt to stop it on the issue of her comparative fault. While in some contexts, even that conduct could be considered an instinctive reaction to unanticipated circumstances, and, thus, the type of general negligence which ordinarily cannot be admitted to prove comparative fault in a strict liability case, we believe the totality of the circumstances in this case created a legitimate jury question on comparative fault.
A jury could reasonably have found from the evidence that plaintiff knew for some period of time before the accident that her Mercedes tended to roll, even when placed in park without the parking brake applied; that she nonetheless left her vehicle without applying the parking brake; and that when she observed the vehicle rolling forward, a phenomenon she could well expect in view of her prior experience, she voluntarily and unreasonably left a position of safety thereby exposing herself to injury. See Cintrone, supra, 45 N.J. at 459, 212 A.2d 769.
*497 Thus, we conclude that plaintiffs' claim of error on this issue is without merit. The jury's determination of plaintiff's fault is affirmed, and need not be re-litigated.

III
The Consumer Expectations Test essentially dictates that a product is considered to be defective if that product does not meet reasonable consumer expectations to "safely do the jobs for which it was built." Suter, supra, 81 N.J. at 171, 406 A.2d 140.
Plaintiffs argue that the consumer expectations test should have been charged, because plaintiff reasonably expected that her car would stay in park, and would not roll. The problem with plaintiffs' theory is that it is not supported by the overwhelming evidence in the case. All experts agreed that the car would not have rolled if it was in park, and there was no basis, short of speculation, to conclude that the gear shift had been placed in park but inadvertently moved out of that gear. Moreover, plaintiff vacillated as to what she did with the gear shift. Given plaintiff's own unsettled state of mind as to where she placed the gear shift, it cannot be said that she had a reasonable expectation regarding a car properly placed in park. If she had placed the gear shift in park, the accident would not have happened. Thus, we find no error in the judge's decision not to instruct on the consumer expectation test.

IV
Apparently as a precaution to prevent the jury from improperly inferring that the Mercedes 300D was not improperly designed because plaintiff continued to own and operate the car, plaintiffs moved at trial to preclude any reference to plaintiff's current ownership and use of the vehicle. The motion was granted by the trial court. Plaintiffs contend that defense counsel asked two questions in violation of that order. The first question, asked in the context of plaintiffs' breach of express warranty claim, inquired *498 as to whether the title to the car was still in the name of G & S Specialty Corporation. Plaintiff replied that it was not. The second question, asked apparently in an attempt by defense counsel to determine whether there was extensive damage to the vehicle as a result of the accident, inquired about repairs made on the car after the accident. Although neither of those questions directly addressed plaintiff's current ownership or use of the car, the trial judge was quick to prevent any further pursuit of the topic.
Subsequently, no further questions were asked by defense counsel which even potentially impacted on the prohibited subject. When plaintiffs requested an instruction that plaintiff's ownership of the vehicle was not to be considered, the request was denied. The trial judge did not abuse his discretion in doing so.
The effort to cleanse the trial of this arguably prejudicial evidence was more undone by plaintiffs' own conduct than anything defense counsel did. The videotaped demonstration by plaintiffs' expert was received in evidence and viewed by the jury. It clearly inferred plaintiff's post accident possession and control. Further, the videotaped portion of plaintiff's deposition, received in evidence as exhibit D-4, and shown to the jury without objection by plaintiffs' attorney, contains a reference by plaintiff in the opening moments of the tape that she had been using the parking brake "since the accident." This evidence offered by, or without, plaintiffs' objection was at least on the same plain as defense counsel's innocuous questions. Plaintiffs' challenge of error on this point is without merit.

V
Defendant Mercedes did not allege at any time that plaintiff misused her 300D. In the context of strict product liability, misuse indicates use of the product for other than its intended or reasonably foreseeable purpose, or, in a manner that is not objectively foreseeable. Johansen, supra, 128 N.J. at 95-96, 607 A.2d 637; Suter, supra, 81 N.J. at 159, 406 A.2d 140. *499 Defendant did not contend that the manner in which plaintiff used her car, i.e., in failing to use the parking brake, in failing to fully engage park, or in failing to turn her wheels away from the road, was other than foreseeable. As such, the issue of misuse was not before the jury. The fact that defendant conceded plaintiff's conduct was foreseeable does not mean it cannot argue that its product was not defective, and that plaintiff's conduct was the proximate cause of the accident. Foreseeable use does not equate with safe use in the context of proximate causation. Johansen, supra, 128 N.J. at 102, 607 A.2d 637.
Plaintiffs' reliance on Jurado v. Western Gear Works, 131 N.J. 375, 619 A.2d 1312 (1993) is misplaced. In Jurado, the defendant manufacturer contended that it did not have to guard an inrunning nip point because it could not have foreseen the manner in which plaintiff used the machine on the date in question. Its expert conceded that, if the use was foreseeable, the area should have been guarded. In such cases, the jury must first determine whether plaintiff's manner of operation is objectively foreseeable, before deciding if the product is defective in light of that use. It is senseless to make a jury go through that exercise in a case such as this where the foreseeability of plaintiff's conduct was conceded.
Thus, the trial judge did not err in refusing to charge misuse.

VI
Plaintiffs' contentions on appeal that Dr. Packer was unqualified to give expert testimony on the subject matter relevant to this case, and that his opinion should have been struck as a net opinion are without merit. As such, they require no discussion by us. R. 2:11-3(e)(1)(E).

VII
The amendments to FMVSS 114, as discussed in 49 C.F.R. part 571.114 and appearing in the Federal Register May 30, 1990 and March 26, 1991, basically require all manufacturers of automobiles *500 with automatic transmissions to incorporate an ignition key interlock system in vehicles sold after September 1, 1992. Plaintiffs sought to introduce the amended version of FMVSS 114 at trial. The trial court precluded plaintiffs from introducing evidence of the amendment.
New Jersey case law has consistently held, in the context of a design defect, that codes or regulations not in effect at the time of manufacture of the product, cannot be admitted to establish the standard for that design. Cepeda, supra, 76 N.J. at 193, 386 A.2d 816; Jackson v. New Jersey Mfgrs. Ins. Co., 166 N.J. Super. 448, 462, 400 A.2d 81 (App.Div.), certif. denied, 81 N.J. 330, 407 A.2d 1204 (1979). Further, where there have been amendments to regulations in existence at the time of manufacture, the controlling regulations are those which existed at the time of manufacture, not those as amended. Shatz v. TEC Technical Adhesives, 174 N.J. Super. 135, 143, 415 A.2d 1188 (App.Div. 1980). The reason for the rule is that the defect must be determined as of the date the vehicle left defendant's control, not some subsequent date when the government decided to take away the design choices Mercedes and other manufacturers had in 1983.
As defendant notes, testimony at trial was undisputed that the Mercedes 300D complied with FMVSS 114 as it existed in 1983. That, of course, does not absolve defendant from making reasonable design choices from available design technology. However, the introduction of the amended regulation would be highly prejudicial in that it tends to focus attention away from the time when defendant's design considerations were made, and the relevant time period on which strict liability law focuses.
The amendment and corollary documents were also inadmissible to prove other issues plaintiffs claim were relevant to their case. Defendant never denied the technological ability to adopt plaintiffs' recommended design changes, and Mr. Stehle, Mercedes' representative, acknowledged that the changes would be inexpensive.
*501 Thus, we are satisfied that the evidence was properly ruled inadmissible on grounds of relevancy and prejudice. For the same reason, any limitation on the scope of plaintiff's cross-examination of Dr. Packer, because of plaintiffs' reliance on these materials, did not constitute an abuse of discretion.

VIII
Finally, we are satisfied from our review of the record, that there was sufficient evidence to support the jury's verdict that defendant's warnings and instructions were not defective, that defendant breached no express warranty, and that plaintiff unreasonably encountered a known risk. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). The error with respect to the risk/utility analysis concerning the design of the gear shift mechanism did not have the capacity to affect the remainder of the verdict. Thus, those issues need not be retried.
The judgment in favor of defendant is vacated, and the matter is remanded for a new trial as limited by this opinion.
NOTES
[1] The claim against Globe Motor Car Company, the dealer where the car was purchased, was settled prior to trial.
[2] References hereafter to plaintiff in the singular shall refer to Mrs. Ladner.
[3] The vehicle was then five years old, and had been driven 88,000 miles.
[4] It appears from the design of the gear mechanism that even if her pocket-book strap caught on the gear shift, the effect would be to pull the shift lever into the "Park" notch rather than out of it.
[5] See footnote 2 supra.
[6] Although this litigation was governed by the Product Liability Act, effective July 22, 1987, N.J.S.A. 2A:58C-1 et seq., the case was tried without reference to it. In any event, the "Act has not appreciably altered the common law interpretation of risk/utility analysis outside of the three absolute defenses." Fabian v. Minster Mach. Co. Inc., 258 N.J. Super. 261, 271-72, 609 A.2d 487 (App.Div. 1992).