293 N.J. Super. 129 (1996)
679 A.2d 733
DENNIS MCGARVEY, PLAINTIFF,
v.
G.I. JOE SEPTIC SERVICE, INC., JOSEPH LOMBARDO, SR. AND STEPHEN DEPALMA, DEFENDANTS-APPELLANTS,
v.
FORD MOTOR COMPANY, INC., RICE & HOLMAN FORD, INC., RICE & HOLMAN LEASING AND/OR AUTOMOTIVE RENTALS, INC., THIRD-PARTY DEFENDANTS-RESPONDENTS. DENNIS MCGARVEY, PLAINTIFF-APPELLANT,
v.
FORD MOTOR COMPANY AND RICE & HOLMAN FORD, DEFENDANTS-RESPONDENTS, AND G.I. JOE SEPTIC SERVICE, INC., JOSEPH LOMBARDO AND STEPHEN DEPALMA, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1996.
Decided August 6, 1996.
*134 Before Judges ARNOLD M. STEIN, KESTIN and CUFF.
John R. Gercke argued the cause for appellants G.I. Joe Septic Service, Inc., Joseph Lombardo and Stephen DePalma in A-352-93T1 (Gercke, Dumser & Feld, attorneys; Mr. Gercke and William C. Popjoy, III, on the brief).
Gary D. Ginsberg argued the cause for appellant Dennis McGarvey in A-354-93T1 (Law Offices of Gary D. Ginsberg, attorney; Brian P. O'Connor on the brief).
William J. Conroy argued the cause for respondent Ford Motor Company in A-352-93T1 and A-354-93T1 (White and Williams, attorneys; Mr. Conroy and Thomas M. Hinchey on the briefs).
Burchard V. Martin argued the cause for respondent Rice & Holman Ford, Inc., Rice & Holman Leasing and Automotive Rentals, Inc. in A-352-93T1 and A-354-93T1 (Martin, Gunn & Martin, attorneys; Burchard V. Martin and William J. Martin on the briefs).
The opinion of the court was delivered by ARNOLD M. STEIN, J.A.D.
We consolidate these appeals for disposition.
We reverse the no cause for action verdict as to defendants Ford and Rice & Holman. We remand for retrial of all strict liability and negligence issues except as to Rice & Holman. We conclude that the Ford LTL-9000 chassis-cab delivered by Rice & Holman to defendants DePalma and G.I. Joe was defective as a matter of law.
*135 At approximately 8:30 p.m. on November 24, 1986, Dennis McGarvey's car collided with the rear frame of a 1987 Ford LTL-9000 incomplete truck chassis-cab driven by Stephen DePalma. G.I. Joe Septic Service, Inc., owned by Joseph Lombardo, purchased the LTL-9000 that evening from Rice & Holman Ford in Merchantville, New Jersey, an authorized Ford dealer. The LTL-9000 is an incomplete vehicle, consisting of a truck cab and rails. Although it can be driven with its own power, the LTL-9000 is usually sent via motor carrier to a second stage manufacturer who customizes it according to the purchaser's specifications. Lombardo planned to use the LTL-9000 as a platform for a septic tank.
DePalma picked up the LTL-9000 that night as a favor to Lombardo. He drove it out of Rice & Holman's lot and travelled south on Route 73. When he turned left into the median strip to make a u-turn onto Route 73 north, the chassis rails protruded into the left southbound lane of Route 73. While DePalma was waiting in the median for traffic to clear, McGarvey's car, which was travelling south on Route 73 in the left lane, struck the protruding rails of the chassis. Although its left-hand turn signal was flashing and its rear lights were on, the chassis did not have rear side lights and reflectors which might have warned McGarvey in time to react to the obstruction.
McGarvey sued G.I. Joe, Lombardo and DePalma for negligence and Ford Motor Co. and Rice & Holman for product defect.
When Lombardo ordered the LTL-9000, he was told by Al Branch, the salesman at Rice & Holman, that the chassis could be shipped directly to the second stage manufacturer if Lombardo advised him of the destination prior to the shipping date. Lombardo did not choose a destination in time and the chassis was shipped to Rice & Holman. Branch testified that the selling dealer was the default destination whenever a purchaser failed to specify a second stage manufacturer destination.
When the chassis arrived, Branch called Lombardo and suggested that he hire a professional carrier to transport the truck to the *136 second stage manufacturer. However, no mention was made of inadequate lighting issues or other safety problems. Lombardo therefore "took it for granted" the vehicle would have all necessary lighting. Lombardo ultimately decided to transport the chassis himself.
At approximately 3:30 p.m. on November 24, 1986, Lombardo telephoned Branch to tell him he wanted to pick up the chassis that evening and take it to his shop. According to Branch, Lombardo said "[h]e was sending his son to pick it up." Branch then "scrambled" to get the paperwork ready. Lombardo's son Ron, who was familiar to Branch, his other son Joe, and DePalma arrived at Rice & Holman at approximately 5:00 that evening.
Branch took them outside to inspect the chassis, and then returned inside with Ron, who paid for the chassis, to prepare the delivery papers. Branch also issued a temporary registration for the chassis. This process took approximately ten to thirty minutes.
Branch testified that he did not recall seeing the three leave, and that "I don't know whether it was night or not. I wasn't out there." However, on cross-examination, he conceded that he assumed they would be driving the truck off the premises:
Q. And, as far as you knew when Mr. Lombardo or the folks that he had sent to pick up that truck got possession of that truck they were going to drive that truck out of your lot; is that correct?
A. That's correct.
Q. You didn't see them come in with any motor carriers; did you?
A. I don't know how they came in.
Q. But you didn't see any motor carriers on the premises, did you?
A. I wasn't looking for any. I don't know how they came.
Q. You assumed they were going to drive the truck off the lot; didn't you, sir?
A. I assume they are, sure.
Q. Sure. And, that's one of the reasons why you went to the trouble to prepare the temporary registration; is that correct?
A. Yes.
DePalma inspected the truck by checking its parking lights, emergency flashers, turn signals, headlights, high beams, rear *137 lights and mud flaps. He was not aware that it was missing side marker lights and reflectors necessary for safe night operation. Neither was Branch nor John M. Repholz, general manager of Rice & Holman Truck Center. Branch had "no idea" whether the chassis could be legally operated on public roads after dark. Both Branch and Repholz stated that the vehicle was delivered in "drive-away condition." As a result, nobody at Rice & Holman advised DePalma or Lombardo's sons that the chassis needed additional lighting to be safely driven after dark.
There were no prominent warnings within the cab concerning additional lighting. Although the incomplete vehicle manual and the certification decal indicated that the chassis did not comply with certain Federal Motor Vehicle Safety Standards, Branch did not suggest reading these items. Moreover, although Branch had reviewed them himself, he was not alerted to the inadequate lighting problem. When asked whether the Rice & Holman representatives generally tell purchasers of incomplete vehicles to read the manual before driving, Repholz replied:
You're talking about approximately 400 pages of literature to read and I would say that if we did tell them to do that they would say okay, thank you, and get in the truck and drive away.... No, we do not tell them to do it.
Ford Motor Co. never told Branch that additional lighting was necessary before the chassis could be driven after dark, nor did Ford require the dealership to put any additional equipment on an LTL-9000 chassis cab before delivering it to a customer. Branch did not even know whether temporary lighting kits were available at Rice and Holman, although Repholz said that Rice & Holman had the capacity to add intermediate side marker lamps and side reflex reflectors if requested. In any case, neither Branch nor Repholz had ever seen anyone add their own lights to a vehicle.
As to the products liability part of the case, McGarvey claimed that the chassis was defectively designed because it failed to contain adequate intermediate side and rear side lights and reflectors and that the failure to warn of this danger rendered it unsafe for night operation, a reasonably foreseeable purpose as to both Ford and Rice & Holman. Ford and Rice & Holman contended *138 that the vehicle's only reasonably foreseeable purpose was transport via motor carrier to a second stage manufacturer. They argued that DePalma's misuse of the chassis by driving it without adding the required lighting was not reasonably foreseeable because they had a reasonable expectation that anyone licensed to operate a heavy truck would have the ability to discover the missing side lights and act accordingly. They also argued that it was DePalma's duty as a motor carrier to install temporary lights before driving it at night.
The jury found Lombardo 35%, DePalma 35% and McGarvey 30% negligent in the accident. The jury also found that at the time of the accident, the truck chassis was not being used or misused for an intended or reasonably foreseeable purpose as to either Ford Motor Co. or Rice & Holman.
Two separate appeals were filed. Defendants G.I. Joe, Lombardo and DePalma raise the following issues as to their third-party claims against Ford and Rice & Holman:
I. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY, AS PER BEXIGA V. HAVIR MANUFACTURING CORPORATION, THAT FORD AND RICE AND HOLMAN WERE NOT ABSOLVED FROM LIABILITY BECAUSE THEY EXPECTED G.I. JOE TO INSTALL ADDITIONAL LIGHTS AND REFLECTORS.
II. THE TRIAL COURT ERRED IN FAILING TO RULE ON THE APPLICABILITY AND TENOR OF THE FEDERAL REGULATIONS PRIOR TO THE COMMENCEMENT OF TRIAL, AND COMPOUNDED THAT ERROR BY REVERSING ITS PRIOR DECISION AFTER ALLOWING EXPERTS TO GIVE CONFLICTING OPINIONS ON THESE ISSUES IN THE PRESENCE OF THE JURY.
III. THE TRIAL COURT ERRED WHEN IT HELD AS A MATTER OF LAW THAT FORD AND RICE & HOLMAN DID NOT HAVE TO COMPLY WITH SECTION 108 LIGHTING REQUIREMENTS.
IV. THE TRIAL COURT IN VACATING THE NOVEMBER 2, 1992 PARTIAL SUMMARY JUDGMENT ORDER ENTERED AGAINST RICE & HOLMAN FORD.
McGarvey's appeal adds the following issue:
POINT TWO: THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT PLAINTIFF'S MOTION FOR A DIRECTED VERDICT AS TO THE ISSUE OF PRODUCT DEFECT.
*139 Before trial, a Law Division judge granted partial summary judgment finding the chassis defective as a matter of law and that the only remaining issue was responsibility for the defect. We reversed because the judge defined "`defective' as synonymous with `unsafe'" and failed to address whether "night operation of the truck was one of its intended or reasonably foreseeable uses (or misuses)." On remand, a different judge granted partial summary judgment against Rice & Holman, finding the vehicle defective as a matter of law when it left Rice & Holman's control. We denied Rice & Holman's motion for leave to appeal, but noted:
Our ruling is not on the merits. Our prior opinion is the law of the case.
We remind the trial judge that in limine type rulings should be made with great caution. See Bellardini v. Krikorian, M.D., 222 N.J. Super. 457, 537 A.2d 700 (App.Div. 1988).
Before testimony began, the trial judge vacated the second partial summary judgment order. Because we must deal with the substantive strict liability issues raised by this appeal, we need not decide whether the previous judge's ruling granting partial summary judgment against Rice & Holman constituted the "law of the case." The difficult strict liability issues presented by this case are better resolved after review of the entire trial record before us for evaluation.
Appellants claim they are entitled to a new trial because (i) the judge should have ruled on the applicability of the Federal Motor Vehicle Safety Standards prior to trial; (ii) the judge erred in finding Standard 108 inapplicable to Ford; and (iii) the "[t]he timing of the decision placed the court's imprimatur on the credibility of the experts presented by Ford and Rice & Holman during the trial."
We disagree with appellants' claim that Standard 108 was applicable to Ford. Federal Motor Vehicle Safety Standard 108 sets forth lighting and reflective requirements for motor vehicles "necessary for signaling and for the safe operation of vehicles during darkness and other conditions of reduced visibility." 49 C.F.R. § 571.108 (1986). The standard applies to trucks, defined *140 in the regulations as "a motor vehicle with motive power, except a trailer, designed primarily for the transportation of property or special purpose equipment." 49 C.F.R. § 571.3(b) (1986).
While the Ford LTL-9000 seems to fit the definition of a truck, it is more accurately described as an incomplete vehicle, which is
an assemblage consisting, as a minimum, of frame and chassis structure, power train, steering system, suspension system, and braking system, to the extent that those systems are to be part of the completed vehicle, that requires further manufacturing operations, other than the addition of readily attachable components, such as mirrors or tire and rim assemblies, or minor finishing operations such as painting, to become a completed vehicle.
[49 C.F.R. § 568.3 (1986).]
By definition, an incomplete vehicle need not necessarily conform to all motor vehicle safety standards. Therefore, Ford may manufacture a chassis-cab such as the LTL-9000 without incorporating all required safety features into its design.
This situation is expressly contemplated by Part 568 of the safety standards. Part 568 requires an incomplete vehicle manufacturer to "furnish with the incomplete vehicle, at or before the time of delivery, a document" listing, among other things, which safety standards the vehicle conforms to and what needs to be done to bring the vehicle into compliance with other standards. 49 C.F.R. § 568.4 (1986). See also 49 C.F.R. § 567.5(a) (1986) (requiring chassis cab manufacturers to affix a label to the cab listing with which safety standards the chassis complies). The trial judge correctly concluded that Ford was not required to produce a cab-chassis that conformed to Standard 108.
We agree with the judge's ultimate conclusion that the Federal Motor Vehicle Safety Standards were not applicable. However, he should have ruled on the issue prior to trial instead of first deciding to leave the issue to the jury. Statutory and regulatory construction is a judicial function, obligating the court "to ascertain the law and explain it to the jury." State v. Grimes, 235 N.J. Super. 75, 80, 561 A.2d 647 (App.Div.), certif. denied, 118 N.J. 222, 570 A.2d 976 (1989). See also Beaugard v. Johnson, 281 N.J. Super. 162, 169, 656 A.2d 1282 (App.Div. 1995); MCG Assocs. *141 v. Dep't of Environmental Protection, 278 N.J. Super. 108, 120, 650 A.2d 797 (App.Div. 1994).
Although the judge later reversed his decision, informing counsel that he would ultimately decide the meaning and applicability of the regulations, he nevertheless permitted the jury to hear extensive and conflicting expert opinions. Testimony was heard over six days, five of which were entirely or mostly consumed with expert testimony. The jury was thus given the impression that the case depended greatly upon whose reading of the regulations was correct. This was not the case. The regulations were not applicable to the strict liability issues.
For example, Ford and Rice & Holman argued that the manufacturer's duty to the purchaser ended with compliance with the Part 568 certification requirements. However, Part 568 simply sets forth a method by which the first-stage, intermediate-stage and final-stage manufacturers share in the responsibility for certifying that the finished truck will comply with all safety standards. See National Truck Equip. v. National Highway Traffic Safety, 919 F.2d 1148, 1151 (6th Cir.1990). It does not contemplate a situation where an incomplete vehicle is delivered to the purchaser who is then expected to complete its transport to the next-stage manufacturer. Compliance with the certification requirements therefore does not address whether a chassis without side lights is defective when it is delivered to the ultimate purchaser before completion.
Similarly, Standard 108 was not useful to the products liability analysis. No party disputed that the chassis was unsafe to drive at night because it lacked side lights and reflectors. Standard 108's requirement of side lights and reflectors only serves as evidence of the product's dangerousness for night driving, which was not disputed at trial. The undue emphasis placed on these regulations at trial had the clear capacity to confuse the jury and to distract the jury's focus from its true function: determining Ford and Rice & Holman's liability in accordance with common law defective design and failure to warn principles.
*142 A design-defect plaintiff "must prove that (1) the product was defective; (2) the defect existed when product left the hands of the defendant; and (3) the defect caused the injury to a reasonably foreseeable user." Jurado v. Western Gear Works, 131 N.J. 375, 385, 619 A.2d 1312 (1993). "[T]he critical issue in design-defect cases is the reasonableness of the manufacturer in marketing that design." Zaza v. Marquess and Nell, Inc., 144 N.J. 34, 56, 675 A.2d 620 (1996). In an inadequate warning case, "the defect is in the failure to warn unsuspecting users that the product can potentially cause injury." Id. at 57, 675 A.2d 620. The elements for proving a product defect are essentially the same for both a design defect and a failure-to warn claim. Jurado, supra, 131 N.J. at 385, 619 A.2d 1312. Whether a product is defective depends on whether it "is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes." Ibid. (quoting Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 394, 451 A.2d 179 (1982)); Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 169, 406 A.2d 140 (1979). This question is in turn answered by undertaking the classic seven-factor risk-utility analysis, considering: (1) the usefulness and desirability of the product; (2) the likelihood and seriousness of injury; (3) the availability of a substitute product; (4) the manufacturer's ability to eliminate the danger without impairing the product's utility; (5) the user's ability to avoid danger by due care; (6) the user's anticipated awareness of the danger considering general public knowledge or the obvious condition or the existence of suitable warnings or instructions; and (7) the feasibility of the manufacturer's spreading the loss by setting the price or carrying liability insurance. Johansen v. Makita USA, Inc., 128 N.J. 86, 96, 607 A.2d 637 (1992).[1] "A component part fabricator also may be held *143 strictly liable for injury caused by a defective component where the defect is in the component part and the part did not undergo substantial change after leaving the manufacturer's hands." Zaza, supra, 144 N.J. at 65, 675 A.2d 620.
"In determining a manufacturer's liability for an allegedly defective product, the inquiry should focus on the condition of the product, not the [consumer's] use of care in operating the product." Johansen v. Makita USA, supra, 128 N.J. at 95, 607 A.2d 637. "The fifth factor of the risk/utility analysis requires the jury to consider the extent to which the hypothetical `average user' of the product  not the plaintiff  could avoid injury through the use of due care." Id. at 101, 607 A.2d 637; Dixon v. Jacobsen Mfg. Co., 270 N.J. Super. 569, 590, 637 A.2d 915 (App.Div.) ("the question of product defect must be decided without reference to the specific conduct or knowledge of the individuals involved in the case, because product safety can only be judged in the context of the average consumer."), certif. denied, 136 N.J. 295, 642 A.2d 1004 (1994).
Ford and Rice & Holman argued that as a motor carrier governed by the Federal Motor Carrier Safety Regulations, DePalma was obligated to ensure that the chassis complied with Standard 108 prior to driving it at night, and that because DePalma had a truck driver's license, he should have known the chassis did not have the lighting required by Standard 108. This shifted the focus of the trial from the condition of the chassis to DePalma's use of care in its operation. While DePalma's use of care in operating the chassis may have been relevant to the issue of proximate cause, it was irrelevant to the risk/utility analysis. Ibid.
*144 The jury did not receive clear instructions as to the proper context for considering DePalma's exercise of due care. The judge's instructions, taken as a whole and in the context of the trial testimony, were capable of misleading the jury that they could consider DePalma's conduct in determining Ford's or Rice & Holman's strict liability under the risk/utility factors. At the beginning of the charge, the judge instructed:
Defendants Ford and Rice & Holman deny there is anything defective about the chassis cab or its design and claim that the vehicle, as designed, was reasonably safe, fit and suitable for its intended or reasonably foreseeable purpose. That is for transport to a second stage manufacturer for installation of the body and completion as a septic tank truck and that defendant DePalma's and defendant G.I. Joe's manner of use of the chassis cab, that is night time operation without temporary side rail lighting was not foreseeable.
As such, defendants argue they had no duty to warn in that their alleged failure to warn, in any event, was of no consequence since defendant DePalma knew or should have known that side rail lighting was absent and of the dangers of driving the vehicle at night without that additional lighting.

[Emphasis added].
During the negligence portion of the charge, he said:
Now, it is also claimed, and this by defendants Ford and Rice & Holman, that defendants DePalma and Lombardo and thus G.I. Joe violated provisions of federal regulations setting forth safety standards governing motor carriers, which I have found, ladies and gentlemen, as a matter of law, applicable to the transportation of the Ford vehicle after it left defendant Rice & Holman's lot.
And those regulations found at Section 393.12 provide the requirements for lighting devices and reflectors on vehicles placed in operation practically identical to those contained in Section 108, which governs only manufacturers and sellers and which require, again, on each side one side marker lamp at or near the front and one side marker lamp at or near the rear; one reflector at or near the front and one reflector at or near the rear.
Now, the statutory and regulatory provisions I have just read to you, ladies and gentlemen, have set up a standard of conduct for the users of our streets and highways. If you find that the defendants DePalma and/or defendant Lombardo have violated one or more of those standards of conduct such violation or violations is evidence to be considered by you in determining whether negligence, as I have defined that term to you, has been established.
That instruction properly assigned DePalma the duty to comply with Standard 108 in determining whether he was negligent. Standard 108 was again discussed in the products liability portion of the charge:

*145 Now, ladies and gentlemen, there has been a lot of discussion over whether the Federal Motor Vehicle Safety Standards pertaining to lighting and set forth in Section 108 apply to this case. As you know from the evidence, Section 108 requires that a truck of 80 inches or more overall width contain, among other items, intermediate side marker lamps, intermediate side reflectors, rear reflectors and rear side marker lamps.
Ladies and gentlemen, you should know that regardless of the application of Section 108 to the defendants herein the federal regulations say nothing that would permit or allow an incomplete vehicle to be driven on public roads or highways at night in the condition in which it ... was operated.
Now, with regard to Section 108 specifically, that provision generally governs manufacturers and dealers or sellers. But as to manufacturers like defendant Ford Motor Company of incomplete vehicles, such as the Ford chassis cab in this case, another part of the Federal Motor Vehicle Safety Standards, that is regulation Section 568, that describes the manner and way in which an incomplete vehicle lawfully may be produced and delivered and that is generally by providing certain prescribed information to the second stage manufacturer as to what equipment still remains to be installed.
So, ladies and gentlemen, to the extent that Mr. Richard, who was the plaintiff's expert, and Mr. Thompson, who was the defendant G.I. Joe's expert, to the extent they concluded or opined to the contrary, that is to the extent they testified that in all circumstances Section 108  108's full lighting requirements fully apply to manufacturers of incomplete vehicles, I'm going to order that testimony stricken from the record and I instruct you as a matter of law as pertains to defendant Ford Motor Company, that Section 108's requirements are modified or limited by the provisions of Section 568, which apply to first stage manufacturers of incomplete vehicles. And it is thus Section 568 which prescribed the method by which manufacturers of vehicles manufactured in two or more stages shall insure conformity of their vehicles with Federal Motor Vehicle Safety Standards such as those contained in Section 108.
The instruction on products liability was not only confusing in content, it was misleading to the extent it could be understood. By instructing the jury that Standard 108 did not apply to Ford, but that the same standard was violated when the chassis was driven by DePalma, the trial judge suggested to the jury that DePalma's conduct had some relevance in its determination of whether the chassis was defective. This was reversible error.
In Ladner v. Mercedes-Benz, 266 N.J. Super. 481, 630 A.2d 308 (App.Div. 1993), certif. denied, 135 N.J. 302, 639 A.2d 301 (1994), the plaintiff was injured when she attempted to stop her parked Mercedes from rolling down a street. She claimed the gear shift *146 was defectively designed because it appeared to be in park but was not. Id. at 485, 630 A.2d 308. At trial, the judge instructed:
[T]he defendant takes the position that you should be aware of the Motor Vehicle and Traffic Act provision which reads as follows. This is N.J.S.A. 39:4-137 and I quote:
"No person having control or charge of a motor vehicle shall allow it to stand on a highway unattended without first effectively setting the brakes thereon and stopping the motor thereof, and when standing on a grade without turning the wheels thereof to the curb or side of the highway."
Now, this statute sets up standards of conduct for users of our streets and highways. I am instructing you regarding this statute only insofar as it may assist you in applying this risk utility test that I've referred to in determining whether there was a design defect in the motor vehicle.
[Id. at 492, 630 A.2d 308.]
We reversed. In Ladner, as in this case, "much was made of [the consumer's] conduct throughout the trial and in defense counsel's summation." Ibid. Therefore, "[t]he invitation to compare the statutory standard to [the driver's] conduct, if not express, was clearly implied." Ibid. We held that "plaintiff's conduct in failing to engage park and apply the parking brake is irrelevant in determining whether there was a design defect in the context of the risk/utility analysis." Id. at 491, 630 A.2d 308. The same reasoning applies here. DePalma's conduct in failing to recognize the absence of side lights and reflectors and failing to install temporary lights is irrelevant to the analysis of whether the chassis was a defective product.
In a strict liability case, when the consumer's conduct is admissible on some issues but not others, a limiting instruction that this conduct "not be considered in the context of the risk-utility analysis is essential." Johansen v. Makita U.S.A., supra, 128 N.J. at 101, 607 A.2d 637. The judge's instructions were clearly capable of permitting the jury to consider DePalma's conduct in determining Ford's and Rice & Holman's liability. Under these circumstances, "[t]he danger that the jury might improperly focus on plaintiff's behavior in deciding the issue of product defect was especially acute...." Id. at 102, 607 A.2d 637.
*147 McGarvey argues that DePalma's use of the chassis was foreseeable as a matter of law as to Ford and Rice & Holman and that because it was undisputed that the chassis was unsafe to drive at night, there was no genuine issue of fact for the jury.
Ford and Rice & Holman contend, as they did at trial, that DePalma's failure to add additional lights to the chassis was unforeseeable because they had the right to reasonably expect any user of the chassis to be a licensed truck driver able to recognize the need for lights and add them to the chassis. This is the "sophisticated user" defense: A manufacturer may argue that only persons with specialized training could reasonably be expected to use a product. In such cases, the manufacturer's duty "is owed only to the reasonably-anticipated sophisticated user, not the untrained interloper." Ramos v. Silent Hoist and Crane Co., 256 N.J. Super. 467, 482-83, 607 A.2d 667 (App.Div. 1992); Olencki v. Mead Chem. Co., 209 N.J. Super. 456, 463, 507 A.2d 803 (Law Div. 1986); Restatement (Second) of Torts § 388 (1965). See also N.J.S.A. 2A:58C-3a(2); L. 1987, c. 197, § 3 (effective July 22, 1987, after this complaint was filed, which codified common law theory in design defect case that the manufacturer or seller will not be liable if the absence of the safety device "would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended...."); N.J.S.A. 2A:58C-4; L. 1987, c. 197, § 4 (also effective after the complaint filing date, codifying principle that adequacy of a warning is measured in light of "the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used.")
Ford and Rice & Holman both contend that the chassis was only intended to be used by experienced motor carriers, and that any other use was unforeseeable. Russell Noble, one of Ford's experts, testified that:
The practice within  uniformly within the chassis manufacturing industry is to turn those chassis cabs over to a forwarder or a carrier who will install the proper *148 lighting  temporary lighting at the rear so that that vehicle can be transported on the highway in conformance with part 393 of the Federal Motor Carrier Safety Regulations.
He opined that Ford would have a reasonable expectation that any competent truck driver who arrived at the dealer would recognize the need for side lights and reflectors and would bring a temporary light kit to place on the truck. This testimony raised a genuine issue of fact as to whether Ford could reasonably rely on the knowledge of a licensed truck driver to discover the missing side lights and reflectors and refrain from driving the vehicle at night without adding temporary lights. It was for the jury to decide whether the failure of a licensed truck operator to discover the missing lights was reasonably foreseeable by Ford considering the average knowledge of licensed truck drivers. If Ford could have foreseen that the chassis would be driven at night by the average consumer at night without lights, the jury could determine after evaluating the appropriate risk factors that Ford's failure to place a conspicuous warning inside the vehicle's cab made the product defective.
As to the design defect theory, Graham Thompson, G.I. Joe's expert, testified that it would be "very feasible" for Ford to add intermediate and rear side marker lights and reflectors to the chassis:
[T]his vehicle as manufactured, the wiring loom on this vehicle has wires that come out along the frame rails for the installation of side marker lights, and the side marker lights are readily available. They could have quite easily been placed on a small bracket on the side of these  on the side of this vehicle, and the type of tail lights used could have been those that have a built-in side light and reflector.
....
It is my opinion that the total cost to someone like Ford Motor Company would be under $30.
If Ford should have foreseen that the chassis would be driven by the average consumer at night without lights, a jury could determine that Ford's failure to install the lights made the product defective.
We reach a different result as to the dealer. The chassis which left Rice & Holman's lot at night without lights was *149 defective as a matter of law. Rice & Holman could not reasonably have relied on the expectation that the person picking up the chassis would have the superior knowledge required to recognize any missing safety features and act accordingly. Both Branch and Repholz testified that they had never seen any purchaser add his or her own lights to a vehicle before driving it off the lot. Branch knew that Lombardo did not want to hire a professional motor carrier; he knew Lombardo was sending his son to pick up the chassis; Lombardo sent his two sons and DePalma to pick up the chassis; Branch did not think any of the three were motor carriers; Branch prepared the temporary registration so the chassis could be driven on the roads; and Branch delivered the chassis over to the three men. It does not matter that Branch may not have actually seen the three men leave the premises with the chassis. He admitted that he assumed they would drive away. His assertion that he did not know whether it was dark when DePalma drove away is untenable. It was already 5:30 p.m. on a November evening when they arrived at the dealer.
Rice & Holman had actual notice that DePalma would not be using a motor carrier to transport the chassis that night. It cannot claim reasonable reliance on DePalma having superior knowledge. DePalma's misuse of the chassis by driving it at night without adding the additional equipment required for safe operation on the roads was not just foreseeable, it was actually known to the Rice and Holman.
Rice & Holman had a duty to make certain that DePalma did not drive the chassis at night without adding temporary side lights. It breached this duty by releasing the chassis to DePalma for immediate use. There are no further issues of fact to be resolved as to whether Rice & Holman delivered a defective product. It did. A risk/utility analysis is inapplicable. Accordingly, we reverse the jury's finding of no cause for action and conclude that the chassis was defective as a matter of law as to defendant Rice & Holman.
*150 We disagree with appellants' claim that the judge should have given an instruction pursuant to Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972), that a manufacturer cannot rely on a third person to install safety devices. In Bexiga, the New Jersey Supreme Court held:
Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him.
[Id. at 410, 290 A.2d 281.]
This instruction is inappropriate when a defendant employs the sophisticated user defense. The issue is precisely whether Ford could reasonably rely on a third person, i.e., the average truck driver, to install safety devices on the product before using it. See Zaza, supra, 144 N.J. at 56-57, 675 A.2d 620 (affirming summary judgment in favor of component part manufacturer because manufacturer's "sole obligation was to produce a component part that was safe and satisfactory according to the specifications by [the purchaser]" where only the second-stage manufacturer hired by the purchaser possessed the ability and specialized knowledge necessary to integrate safety devices into the completed product).
We note that there should be no percentage of liability assessed against Lombardo individually because he was not an active tortfeasor and thus is insulated from individual responsibility by the corporate structure. "It is a basic tenet of corporate law that a corporation is an entity separate and distinct from its shareholders. Only upon proof of fraud or injustice will the corporate veil be pierced to impose liability on the corporate principles." Department of Labor v. Berlanti, 196 N.J. Super. 122, 127, 481 A.2d 830 (App.Div.), certif. granted, 99 N.J. 151, 491 A.2d 666 (1984), appeal denied, 101 N.J. 568, 503 A.2d 846 (1985). The liability of G.I. Joe is based upon the doctrine of respondeat superior. If DePalma was negligent in driving the chassis without lights or was otherwise negligent in his operation of the vehicle, *151 there should be only one assessment of negligence against DePalma and G.I. Joe as a unit.
There is a jury question as to whether Ford sent a defective product into the stream of commerce. As a matter of law, Rice & Holman sent a defective product onto the public roads after delivery from Ford. The issues of whether McGarvey, DePalma and G.I. Joe were negligent must be retried because the jury is required to assess the comparative fault of all the parties to the action.
Reversed and remanded for a new trial in accordance with the rulings set forth in this opinion.
NOTES
[1] Verge v. Ford Motor Co., 581 F.2d 384 (3d Cir.1978), set forth three factors: trade custom, relative expertise and practicality, to be considered when determining responsibility for the absence of a safety device. New Jersey has "limited the factual inquiry for determining responsibility for the lack of a safety device to the question of practicality or feasibility of the installation of a safety device by the component manufacture[r]." Zaza, supra, 144 N.J. at 51, 675 A.2d 620; Michalko, supra, 91 N.J. at 395, 451 A.2d 179. This test has been usually applied when a finished product has been worked on by more than one manufacturer, and is relevant to determining which manufacturer should have installed a safety device. Here, only Ford had worked on the chassis before the accident occurred. Therefore, Ford's liability is to be determined according to the traditional risk/utility analysis.